Edward ESPARZA, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–06–00043–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 30, 2007.

Discretionary Review Granted
Feb. 6, 2008.

Edward Ray Esparza, Lovelady, for Appellant.

Charles A. Rosenthal, Jr., Dist. Atty.–Harris County, Peyton Z. Peebles, III, Asst. Dist. Atty., Houston, for State.

Panel consists of Chief Justice RADACK and Justices JENNINGS and BLAND.

## OPINION

TERRY JENNINGS, Justice.

A jury found appellant, Edward Esparza, guilty of the offense of aggravated sexual assault.[1] This Court, in an unpublished opinion, affirmed appellant's conviction, but remanded for a new trial on punishment only.[2] On remand, a second jury assessed punishment at confinement for life, and the Fourteenth Court of Appeals affirmed appellant's sentence in an unpublished opinion.[3] Subsequently, appellant filed a motion for post-conviction DNA testing, which the convicting court denied on September 27, 2005.[4] In his sole point of error, appellant contends that the convicting court erred in denying his motion for post-conviction DNA testing.

We affirm.

## Factual and Procedural Background

At trial, Hermina Cantu Lucero, the complainant's aunt, testified that on the evening of January 1, 1994, she, the complainant, the complainant's sister, Mary Cantu, and "some other members of the family and friends" went to a nightclub in Houston around 9:30 or 10:00 p.m. Lucero and the complainant were living in Bryan, Texas at the time and drove into Houston for the night. While at the nightclub, appellant was standing near where Lucero was standing, and she noticed that appellant "kept starting and eventually he came and asked [her] to dance." Lucero explained that this occurred around 10:30 or 11:00 p.m. The two danced several times, appellant bought her a drink, and they talked for "a couple of hours." When Lucero, appellant, and the complainant were leaving the club between 1:30 and 2:00 a.m., Lucero noticed that the complainant's car had been towed. The three then went back inside the club and discovered the location to which the car had been towed.

Lucero stated that appellant volunteered to drive Lucero and the complainant to the tow yard, and the three followed Cantu and her friend there. Upon arriving at the tow yard, they realized that they did not have enough money to pay the impound fee. Lucero and the complainant had to return to Bryan because the complainant had to be back at 6:00 a.m. to go to work, and they accepted appellant's offer to drive them back to Bryan.

With Lucero in the front passenger seat and the complainant in the backseat, the two gave appellant directions to Bryan. As they were traveling on Highway 290 toward Bryan, Lucero woke the complainant and told her that she "was really scared" and appellant "was acting weird." Lucero explained that when she woke the complainant, the complainant did not appear to be oriented as to where she was or understand what was going on. The complainant was "still half asleep" and "not

1. See Tex. Pen.Code Ann. § 22.021 (Vernon Supp.2006).

2. Esparza v. State, No. 01–95–00182–CR, 1996 WL 404028 (Tex.App.-Houston [1st Dist.] July 18, 1996, no pet.) (not designated for publication).

3. Esparza v. State, No. 14–97–00440–CR, 1999 WL 548237 (Tex.App.-Houston [14th Dist.] July 29, 1999, pet. ref'd) (not designated for publication).

4. See Tex.Code Crim. Proc. Ann. art. 64.03(a) (Vernon 2006).

really coherent to what [was] going on at that time."

Lucero eventually managed to get out of the car and "took off running to the highway because cars were coming and [she] wanted to get help." When Lucero looked back, she saw that the complainant was still in the backseat and appellant was out of the car. When Lucero saw appellant get out of the car, she "had a feeling he was coming after [her], so [she] ran to the other side where the other oncoming cars were coming." After no one offered to stop to assist her, Lucero "took [her] shoes off and [she] continued running" and stopped at the first house she came to. Lucero told the residents that the complainant was in danger and to call for emergency assistance. When police officers arrived at the residence, Lucero explained what had happened, gave the officers appellant's business card that he had given her, which contained his name printed on the card, and asked them to help her find the complainant. After an officer called in the complaint, he learned that the complainant had already been found and taken to a hospital.

The complainant testified that as they were driving to Bryan, she fell asleep in the backseat of the car, and the "next thing [she] knew [she] was waking up because [they] were pulled over." After Lucero escaped, appellant came back to the car, got in the driver's seat, and told the complainant that if she got in the front seat and did what he told her to do, she would be alright. The complainant climbed backwards into the front seat, and appellant told her to put her head down. She explained that she still had not gotten a good look at appellant. As she faced the dashboard, appellant "laid his hand over" the complainant "as if he was using [her] head as an arm rest."

As appellant drove back toward Houston, the complainant was crying, and appellant "started being nice" and told her that "he wasn't going to hurt" her and would "take [her] back into town and drop [her] off somewhere." Then, appellant pulled over the car, "reclined his seat back a little bit," and "unzipped his pants." The complainant explained that she "knew something was going to happen." They were in a dark area, appellant "withdrew his penis and he told [the complainant] he knew [she] did this with [her] husband." Appellant "drew [the complainant] closer to him and he put [her] head between his legs and he stuck his penis in [her] mouth and the thought made [her] gag and [she] kept gagging." Appellant told the complainant that "if [she] threw up on him, [she] would be sorry ... [a]nd he would hurt [her] really bad." Appellant then told the complainant "to roll over on [her] stomach and pull [her] pants down." He "reclined the passenger's seat and he pushed [her], to roll over on [her] stomach, and [she] had [her] head turned toward the passenger's window, looking out that way, and [she] knew he had climbed on top of [her] from behind." Appellant got on top of the complainant and began having vaginal intercourse. The complainant explained that at no time was the vaginal or oral intercourse consensual.

The complainant stated that "[o]nce he had finished and he pulled out, he asked me if I had come, if I had come when he came. And I told him yes I had because I figured if I told him no, he would start all over again and I didn't want to go through it again." After appellant "was done," he picked up a bandana, poured Coke over it, and told the complainant "to make sure [she] cleaned [herself] well." The complainant explained that she cleaned herself, but not in the manner that appellant had ordered. Appellant told the complainant that he was going to drop her off and for

her "to phone somebody, anybody, he didn't care who, just as long as it wasn't the police because he made" the complainant give him her Texas Driver's License and he memorized the information.

The complainant further testified that appellant then drove back into town, "stopped at [a] corner and he told [the complainant] not to look at him, not to look at the car and to walk away in the opposite direction that he drives." After appellant drove off, the complainant walked to a convenience store and called for emergency assistance. When police officers arrived, the complainant explained what had happened, and was taken to a hospital for a rape kit. When questioned as to whether she could identify her attacker, she explained that she did not "remember what he looked like" because she never got a good look at his face while they were at the club and, while in the car, she was never able to "get a good look at him" because he kept her "face down." The complainant stated that she knew appellant had raped her because Lucero and Cantu identified appellant as the man in the car and "[h]e was the only person the whole time in the car."

Mary Cantu, the complainant's sister, testified that appellant was the man that left the nightclub with Lucero and the complainant.

Harris County Sheriff's Deputy D.R. Warren testified that during the early morning hours of January 2, 1994, he was dispatched to a sexual assault call in Hockley, Texas. Warren explained that upon his arrival, Lucero told him of the last location where she had seen appellant and the complainant. When Warren arrived at that location, he "received a call from another officer from L.B.[J.] Hospital that they had" the complainant. Lucero gave Warren appellant's business card.

Emilia Leiva, appellant's wife, with the assistance of a Spanish translator, testified that on the evening of January 1, 1994, she and appellant went to her sister's house around 8:00 p.m. "or a little after" and were there with family and friends "until about 2:15, 2:45 or 2:30." She described appellant as wearing a "plaid shirt, some khaki pants and some black shoes."

Freddy Galvan, Emilia's brother-in-law, with the assistance of a Spanish translator, testified that Emilia and appellant arrived at his house "between 8:00 and 8:30" on January 1, 1994. The three then went to the house of a friend, Misael Rivas, and they "were there for about an hour, while they got dressed, and then [they] came home." When they arrived "at home," they were making plans because [they] wanted to go [out] and then it was late and [they] stayed there "at home." According to Galvan, Emilia and appellant left Galvan's house around 1:00 or 1:30 a.m.

Misael Rivas, with the assistance of a Spanish translator, testified that on January 1, 1994, Galvan, Emilia, and appellant arrived at Rivas's home at around 9:00 or 10:00 p.m. They were there for approximately one to one and one-half of an hour, and then decided to go to Galvan's house. After they all went to Galvan's house, Rivas returned home between 11:00 and 11:30 p.m. Rivas stated that Galvan, Emilia, and appellant remained at Galvan's house after Rivas left.

Milagro Leiva, appellant's sister-in-law, with the assistance of a Spanish translator, testified that she hosted a party at her house on the evening of January 1, 1994. At around 8:00 or 9:00 p.m., appellant, Emilia, Milagro, and her family were present. Rivas and his family arrived at Milagro's house around 9:00 or 10:00 p.m. According to Milagro, Rivas and his family left around 11:00 p.m., and appellant and Emilia left around 1:00 or 2:00 a.m.

Before the defense rested, at a bench conference, the following exchange occurred,

[Appellant's counsel]: At this time I would respectfully request leave of the Court that it's time to give a reasonable amount of time to subpoena or try to bring in Pamela McGinnis along with the rape kit.

[Court]: Have you made that contact with her?

[Appellant's counsel]: No, we have not made contact with her.

[Court]: What do you expect?

[Appellant's counsel]: Well, basically, as I understand, her testimony was unable to link. Her testimony is not going to be able to link along with commit any rape that evening. I believe I read in the offense report where [the complainant] had sex a day or two before this and they had found some vaginal smears, some sperm, and I just want to [sic].

[Court]: What hospital does she work in?

[Appellant's counsel]: She don't work at an office. She works at the [Medical Examiner's] Office.

[State]: And I have a question, you are saying this evidence somehow clears your client?

[Appellant's counsel]: No, but it would help elicit.

[State]: In what way?

[Appellant's counsel]: It did have a swab and a smear. There was testimony by [the complainant] that she had applied some Coca Cola on a bandana, that she attempted to clean up, that she didn't clean herself out and that I want the jury to hear her testiomny [sic] from the individual that conduct-

ed the examination of the complaining witness following the rape.

[Court]: What would she testify to bearing on this case?

[State]: The semen was found inside.

[Appellant's counsel]: No, the semen was found on the cotton swab but it [is] inconclusive.

[State]: I'l [sic] show you the report. That's not what it says.

The trial court indicated that if Pamela McGinnis was not present in court by a certain time, then appellant would rest at that time. McGinnis never testified at trial.

Following his conviction, appellant, acting pro se, filed a motion for DNA testing and appointment of counsel.[5] In his motion, appellant asserted that (1) "DNA testing is necessary because the evidence was not DNA-tested, and counsel did not file a motion for DNA-testing at that time"; (2) "it was through no fault of his own that the forensic evidence was not tested, and such testing would have shown him innocent of having committed an aggravated sexual assault"; (3) "if DNA testing were to be conducted there would be no re-trial of the aggravated sexual assault charge due to Movant's establishment of his innocence of that charge"; and (4) "in the interests of justice, DNA testing of the forensic evidence is necessary for the establishment of Movant's actual innocence of the offense charged and the resultant sentence imposed due to said allegation." In his attached affidavit, appellant testified that a "DNA test of the forensic evidence gathered at the time of the alleged occurrence of the offense ... will reveal that [he] [is] not the perpetrator of said offense."

5. The trial court appointed counsel to represent appellant. However, it appears that appointed counsel filed no documents on appellant's behalf.

The State conceded that it still had the evidence in custody, but requested that the trial court deny the motion for DNA testing because appellant failed to establish "by a preponderance of the evidence that he would not have been convicted if exculpatory evidence had been obtained through DNA testing." Additionally, the State asserted that "the appellate record contains assertions made by [appellant's] trial counsel, who stated that the complainant had sexual relations a day or two prior to the sexual assault offense as reflected in [a] ... bench conference outside the hearing of the jury." Additionally, the trial prosecutor submitted an affidavit in which he testified that the offense report reflected that the complainant reported that she had sex two days prior to the instant offense. Assuming that another unknown male's DNA was found present, and not appellant's, the State argued that such "seemingly favorable test results would not constitute exculpatory evidence" because "[a]ny DNA not contributed by [appellant] could be attributed to the person with whom the complainant had sex prior to the [instant] offense."

After adopting the State's proposed findings of fact, the trial court found that appellant "failed to meet the burden of proof requirements under Article 64.03(a)(2)"[6] and entered an order denying appellant's motion for DNA testing.

## Standard of Review

■ We review a convicting court's denial of post-conviction DNA testing under a bifurcated standard of review. *Rivera v. State*, 89 S.W.3d 55, 59 (Tex.Crim. App.2002) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997)). We afford almost total deference to the convicting court's determination of issues of historical fact and application-of-law-to-fact

issues that turn on credibility and demeanor, while we review de novo other application-of-law-to-fact issues. *Id.* The ultimate question of whether a reasonable probability exists that appellant would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing is an application-of-law-to-fact question that does not turn on credibility and demeanor and is therefore reviewed de novo. *Id.; see also Smith v. State*, 165 S.W.3d 361, 363 (Tex.Crim.App. 2005).

## Article 63.03(a)(2)(A)

■ To grant a motion for post-conviction DNA testing, a convicting court must determine whether (1) evidence, which has been subjected to a significant chain of custody to establish its integrity, exists in a condition making DNA testing possible; (2) identity was or is an issue in the case; and (3) the defendant has established, by a preponderance of the evidence, that he would not have been convicted if exculpatory results had been obtained through DNA testing. TEX.CODE CRIM. PROC. ANN. art. 64.03(a) (Vernon 2006); *see also Wilson v. State*, 185 S.W.3d 481, 484 (Tex. Crim.App.2006). The issue before us is whether appellant established by a preponderance of the evidence that he "would not have been convicted if exculpatory results had been obtained through DNA testing." TEX.CODE CRIM. PROC. ANN. art. 64.03(a)(2)(A).

The State argues that because it was established at the bench conference at trial and by the affidavit of the trial prosecutor that the complainant "had sex two days before the attack, any DNA test results showing the presence of a male DNA other than appellant's would not raise a reason-

6. *See* TEX.CODE CRIM. PROC. ANN. art. 64.03(a).

able probability that appellant would not have been convicted."

Appellant argues that because "[t]here was no evidence presented at trial or at the DNA motion hearing that the complainant had sexual relations two days prior to the alleged assault, ... any 'biological matter found in the physical evidence' could only have come from the assailant." [7] He asserts that because, "[a]ccording to the complainant, her assailant ejaculated inside her vagina" [8] and that "after her assailant had finished, he told her to clean herself up with a bandana and coke, absent evidence to the contrary, this establishes that a condom was not used during the assault," and "therefore, any semen found would be that of the assailant." In support of his argument, appellant relies on *Smith v. State,* 165 S.W.3d 361 (Tex.Crim. App.2005).

In *Smith,* the Texas Court of Criminal Appeals concluded that the trial court had enough evidence to determine by a preponderance of the evidence that favorable DNA results would have prevented Smith's conviction. *Id.* at 365. The State used the presence of seminal fluid, obtained during an examination conducted about eight hours after the attack, to indicate that a sexual assault had occurred. *Id.* at 364. The seminal fluid obviously did not belong to the female complainant, and she did not testify that she had intercourse with anyone other than the attacker who could have left the seminal fluid. *Id.* at 365. Nevertheless, the State argued on appeal that because the complainant lived with her boyfriend at the time of the sexual assault, it was *"possible* that she had intercourse with him in the 24 hours preceding the attack and that it was his seminal fluid that was found during the exam and not the attacker's." *Id.* at 364 (emphasis added). The court rejected this argument because there was in fact no evidence that she had engaged in sexual intercourse with anyone else prior to the attack. *Id.* at 365. Thus, results indicating that the defendant's DNA did not match the seminal fluid would have been exculpatory, and as such, the defendant was entitled to DNA testing. *Id.*

Here, the complainant did testify that after appellant "had finished and he pulled out, he asked me if I had come, if I had come when he came" and that after appellant "was done," he picked up a bandana, poured Coke over it, and told her "to make sure [she] cleaned [herself] well." However, the State did not use the presence of seminal fluid to indicate that a sexual assault occurred. Moreover, the trial record reveals, as noted above, that appellant's trial counsel, outside the presence of the jury, informed the trial court that the complainant had had "sex a day or two before" the sexual assault. Appellant's trial counsel even conceded to the trial court that the rape kit evidence would not "clear" appellant. Also, the State, during the post-conviction proceeding, presented the affidavit testimony of the trial prosecutor, who stated that the police offense report reveals that the complainant had in fact had sex with another individual two days

7. We note that appellant argues that the trial prosecutor's affidavit "is indicative only that a bench conference occurred" and that its contents relate to "matters outside the record." However, appellant did not object or present this argument to the convicting court. *See Poindexter v. State,* 153 S.W.3d 402, 406 (Tex. Crim.App.2005) (stating that "once the trier of fact has weighed the probative value of unobjected-to hearsay evidence in its factfinding process, an appellate court cannot deny that evidence probative value or ignore it in its review of the sufficiency of the evidence").

8. Our review of the record reveals that the complainant did not specifically testify to this at trial.

prior to the offense. Thus, in contrast to the situation in *Smith*, the presence of DNA other than appellant's in this case would not necessarily be exculpatory.

We note that a preponderance of the evidence that a person would not have been convicted does not exist if there is sufficient evidence, other than the DNA evidence in question, to establish guilt. *See Johnson v. State*, 183 S.W.3d 515, 520 (Tex.App.-Houston [14th Dist.] 2006, pet. dism'd). In the present case, the State relied on the testimony of Lucero, the complainant's aunt, and Mary Cantu, the complainant's sister, to identify appellant as the person who Lucero met at the club, and, thus, the man in the car with the complainant at the time of the sexual assault. There is no evidence in the record indicating that any DNA evidence recovered from the complainant would have belonged only to her assailant. Accordingly, we hold that appellant has failed to establish, by a preponderance of the evidence, that he would not have been convicted if favorable DNA results had been obtained through the requested testing.

We overrule appellant's sole point of error.

### Conclusion

We affirm the order of the trial court.

Justice BLAND, dissenting.

JANE BLAND, Justice, dissenting.

Had the trial court ordered DNA testing in this case pursuant to Article 64.03, it is doubtful that the results of the test would do anything other than further inculpate appellant as the assailant—and, had this case been tried when such testing was widely available, it might have been done in preparation for the trial. But Article 64.03 requires that we assume that "exculpatory results" would be obtained for the

purpose of considering whether to order a test to be conducted—that is, the statute requires a defendant to establish "that he would not have been convicted if exculpatory results had been obtained through DNA testing." TEX.CODE CRIM. PROC. ANN. art. 64.03(a)(2)(A) (Vernon 2006). Whether that assumption turns out to be true or false is the subject of a different proceeding—in which appellant would bear the burden of proving by clear and convincing evidence that the test results are, indeed, exculpatory, and that with them in hand he would not have been convicted. The trial court here did not allow the test, though the State concedes both that testable evidence exists and that identity was contested at trial, with appellant calling several alibi witnesses and pointing out that the complaining witness was unable to identify him (though her aunt and sister both emphatically did).

Our court affirms the trial court's decision, concluding that it could not be possible for the DNA results in this case to be exculpatory because it is possible that the complaining witness had sex two days before the incident. In my view, the Court of Criminal Appeals' decision in *Smith v. State* rejects such a conclusion in the circumstances presented by this case. *See* 165 S.W.3d 361, 364–65 (Tex.Crim.App. 2005) ("The evidence that the attacker did leave seminal fluid at the time of the attack, combined with the lack of any evidence that the victim had intercourse with anyone other than her attacker during the 24 hours preceding the exam indicates that the seminal fluid belongs to the attacker."). The assertion that a complaining witness possibly had sex two days before the incident does not render DNA test results so void of evidentiary weight so as not to order the test, as the plain language of the statute requires, given that the semen samples in this case were taken immediately after the offense.

The State relies upon a bench conference at appellant's trial, during which appellant's trial counsel refers to an offense report that stated that the complainant had sexual relations two days before the sexual assault offense. In its response to the motion for DNA testing, the State supported the bench conference colloquy with an affidavit from a prosecutor that his review of that offense report reflects that the complainant reported that she had sex two days before the offense. It is undisputed that no witness testified about any prior sexual activity of the complaining witness, nor has the State ever admitted the offense report as an exhibit. Relying on the bench conference and the State's affidavit, the State contends, and the majority agrees, assuming that another unknown male's DNA was found in the seminal fluid, and not appellant's, such "seemingly favorable test results would not constitute exculpatory evidence" because "[a]ny DNA not contributed by [appellant] could be attributed to the person with whom the complainant had sex prior to the [instant] offense."

This case is similar to *Smith* in that: (1) no evidence exists in the convicting court record or this record that the complaining witness had sex with anyone else in the 24 hours before she was assaulted; (2) the complaining witness testified that the seminal fluid of her attacker was present after the rape; and (3) a rape kit done almost immediately after the assault recovered seminal fluid. *See* 165 S.W.3d at 364–65 (holding that trial court erred in not ordering DNA testing where above facts were present). Assuming that the fluid does not match appellant's DNA (as we must for purposes of considering whether to order the test), it is likely to carry exculpatory weight. *See id.* at 365 (noting that there was "at least a 51% chance" that the defendant would not have been convicted if DNA test results did not match the defen-

dant). The majority's holding disallows DNA testing based on an assertion that the complaining witness had sex two days earlier. As in *Smith*, such an assertion raises no more than a possibility that the DNA test results would not be exculpatory. *Id.* It is not a basis to deny the test in the first instance. The assertion of possible prior sexual activity in this case is too remote from the offense to conclude that DNA test results from evidence obtained after the offense would carry no evidentiary value—rather, like in *Smith*, the DNA recovered after the attack in this case is more likely than not to belong to the attacker.

Because the majority's opinion presumes that the possibility of remote sexual activity (two days earlier, according to the prosecutor's accounting of the police report) negates any evidentiary weight of DNA test results performed on evidence retrieved immediately following the offense, inconsistent with the Court of Criminal Appeals' decision in *Smith v. State*, I respectfully dissent.