

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-1616-07

---

**EDWARD ESPARZA, Appellant**

**v.**

**THE STATE OF TEXAS**

---

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIRST COURT OF APPEALS
### HARRIS COUNTY

---

**KEASLER, J., delivered the unanimous opinion of the Court.**

### O P I N I O N

The court of appeals upheld the trial judge's refusal to grant Edward Esparza's motion

for DNA testing. The court held that testing showing the presence of DNA not belonging

to Esparza would not prove his innocence because (1) the victim reported having sex two

days before the attack, and (2) there was overwhelming eye-witness testimony establishing

Esparza's guilt.[1] We reverse the court of appeals's judgment and remand this case for

---

[1] *Esparza v. State*, 264 S.W.3d 82, 87-88 (Tex. App.—Houston [1st Dist.] 2007).

proceedings consistent with this opinion.

## Background

The victim, Guadalupe Rios, and her aunt, Hermina Cantu Lucero, drove from Bryan, Texas, their hometown, to Houston, Texas on the evening of January 1, 1994. The two met Rios's sister, Mary Cantu, and Cantu's boyfriend at Zaz Tijuana Club. Rios and Lucero arrived at the club between 9:30 and 10:00 p.m., and Esparza asked Lucero to dance about a half hour later. Lucero and Esparza spent the night talking and dancing. Esparza told Lucero that he had just turned forty and worked for the "Shell Company." He also gave Lucero his business card. Lucero introduced Esparza to Rios, but Rios only glanced at him because she was looking through the crowd for a friend who was supposed to meet her. Rios's friend never showed up, and Rios was upset when she and Lucero left the club between 1:30 and 2:00 a.m.

Esparza walked Rios and Lucero to Rios's car. Rios's car, however, was gone; it had been towed away. The three returned to the club, and Rios found Cantu and told her what happened. Cantu and her boyfriend offered to drive Rios and Lucero to the impound lot. Esparza extended the same offer, and Lucero accepted Esparza's offer. Rios joined them so that Lucero would not be alone with Esparza. Esparza followed Cantu and her boyfriend to the impound lot. Rios and Lucero did not have enough money to get Rios's car from the lot, and because Rios had to be at work at 6:00 a.m., both Esparza and Cantu's boyfriend offered to drive Rios and Lucero back to Bryan. Lucero thought that Esparza was nice and noted that

he behaved like a perfect gentleman all evening, so she accepted Esparza's offer. Rios did not pay much attention to Esparza because she was irritated and upset that her friend did not meet her.

Lucero sat in the front passenger's seat of Esparza's light blue, four-door car. Rios got in the backseat behind Lucero, put her head down, and went to sleep. They headed to Bryan on Highway 290. Esparza stopped at a gas station and bought a Coke. After this, while driving again on Highway 290, Esparza became "indecisive" about the direction that he was going; he cut across the road several times, changing directions. Lucero became "scared" and "very nervous." Esparza pulled off the road to go to the bathroom. When he got out of the car, Lucero woke up Rios and told her that she was scared. Lucero explained that Esparza was "acting weird" and had been "going around in circles." Rios, who had been in a deep sleep, became scared and tried to discern where they were.

When Esparza got back in the car, he directed Lucero to "come closer." Lucero said, "no." Esparza grabbed her neck, forced her toward him, and tried to kiss her. She told him, "no," and Esparza responded by calling her a "bitch." Esparza started driving, cut across the road again, pulled off to the side of the road in a dark area in the "middle of nowhere," and stopped. He ordered Rios and Lucero to get out of the car. When they refused, Esparza got out of the car, grabbed Lucero and dragged her to the front of the car. He said, "stay here, bitch, or else" and threatened to kill her. He then pulled Rios out of the car by her hair and dragged her to the front of the car. He instructed the women to get on their knees and said,

"I'm going to teach you what I do with bitches." He grabbed both of them by the hair and slammed their heads together. He continued to do this while saying "fuck you, fuck you" over and over. After threatening to kill them, he walked back to the car and opened the trunk. Lucero told Rios that they needed to run or they would die. Rios froze. Esparza overheard Lucero and threatened to kill them again as he walked to the front of the car. He grabbed Rios and Lucero and ordered them into the backseat of the car. Lucero entered first, then opened the door on the other side of the car and took off running. Esparza grabbed Rios by the hair and told her not to move. Lucero continued to run and look for help, but no one traveling on the highway stopped to help.

Esparza got back into the driver's seat and ordered Rios to climb into the front passenger's seat. After Rios placed her head on the arm rest at Esparza's insistence, Esparza placed his arm over Rios's head. Esparza drove back onto Highway 290, heading toward Houston. While her head was down, Rios noticed a zipped gun case and fireworks on the floorboard in front of her. The sight of the gun case frightened Rios. Esparza exited Highway 290. He told Rios that he was not going to hurt her and that he was taking her back to town so that he could drop her off somewhere. Instead, Esparza pulled over, reclined his seat, unzipped his pants, withdrew his penis, and told Rios that "he knew that [she] did this with her husband." He then pushed her head toward his penis and forced it into her mouth. Rios gagged, and Esparza threatened to hurt her if she threw up on him. He told her to roll over on her stomach and pull her pants down. When Rios complied, Esparza climbed on top

of her from behind and inserted his penis into her vagina. When Esparza finished, "he pulled out" and asked Rios if she had "come when he came." Esparza then soaked a bandana with Coke and told Rios to clean herself "well." Rios cleaned herself but did not do it well, as Esparza had directed. Esparza then gave her change so that she could call somebody when he dropped her off. He told her she could call anyone but the police. He took her driver's license, studied her address, and warned her that he knew where to find her if she called the police.

Esparza dropped Rios off on a corner in Houston and drove away. Rios walked about a block and a half until she found a convenience store. She called 911. When the police arrived, she reported what happened and went to the hospital. Around this time, Lucero finally found someone to call the police. Shortly after the police arrived, she learned that Rios was in the hospital. She told police that their attacker was named "Ed," a name that she remembered because one of her brother's has the same name. She also gave the police the business card that Esparza gave her at the club.

At the hospital, a nurse compiled a rape kit, which included biological specimens collected from Rios's vagina and nails.

Rios could not identify Esparza before or at trial. She testified, however, that, based on what Lucero and Cantu told her, she believed that Esparza was her attacker.

Lucero identified Esparza in a photo line up about a month after the offense and again at trial. At the photo line up, Lucero hesitated when identifying Esparza because when she

met him, he had facial hair, which he did not have in the photograph. At trial, Lucero testified that she had no doubts that Esparza was the man who she met at the club. She stated that she could never forget the face of the man that slammed her and Rios's heads together.

Cantu testified that she was positive that Esparza was the man that left the club with Lucero. She "looked at him for a long period of time when [they] were in the club."

The business card that Esparza gave to Lucero at the club was admitted into evidence. The card identified Esparza as a certified paralegal who worked for Ruben F. Valdes, Esparza's trial attorney, in Houston.

Esparza presented an alibi defense. According to family members and an acquaintance, Esparza was with them at an impromptu family gathering when the offense occurred.

Esparza's wife, Emilia Levia, testified that she and Esparza went to her sister and brother-in-law's house around 8:00 p.m. on January 1st. Although they had plans to go dancing, they decided to stay at her sister's house because she felt sick. They had dinner and drinks and left the house sometime between 2:15 and 2:45 a.m. Emilia stated that her husband worked for a temporary employment agency. When asked if Esparza had a job with "Shell," Emilia said that she did not know; she only knew that he was working somewhere in downtown Houston. Emilia also stated that her husband turned forty in February 1994.

Esparza's brother-in-law, Freddy Galvan, confirmed that Emilia and Esparza came to his house around 8:00 p.m. on the 1st. He testified that he and his wife celebrated the New

Year with Emilia and Esparza on December 31st and January 1st. He stated that Emilia and Esparza left his house around 1:00 a.m. on the 2nd. In celebrating the New Year, the family set off fireworks. Galvan also testified that Emilia owned a light blue, four-door car.

Misael Rivas, Emilia's friend, testified that Emilia and Esparza came to his house on the evening of the 1st. He and his family then went to Galvan's house with Emilia and Esparza and stayed there until about 11:00 p.m.

Emilia's sister, Milagro Levia, testified that Emilia and Esparza came to her house between 8:00 and 9:00 p.m. on the 1st and left between 1:00 and 2:00 a.m. on the 2nd. Rivas and his family arrived around 9:00 or 10:00 p.m. and stayed for about an hour.

After these witnesses testified, during a bench conference, Esparza's attorney, Valdes, requested additional time so that he could get a nurse from the Harris County Medical Examiner's Office to testify and bring the rape kit. In making this request, he told the trial judge that the nurse's testimony would be unable "to link" Esparza to the rape when read in conjunction with the offense report, which indicated that "Rios had sex a day or two before" the offense. The trial judge asked if the evidence from the rape kit somehow cleared Esparza. Valdes said that it would not and stated:

> It did have a swab and a smear. There was testimony by Ms. Rios that she applied some Coca Cola on a bandanna, that she attempted to clean up, that she didn't clean herself out and that I want the jury to hear her testimony from the individual that conducted the examination of the complaining witness following the rape.

Valdes then stated that semen was found on the swab but that it was inconclusive. The trial

judge gave Valdes more time to get the nurse in court by the end of the lunch hour when they would reconvene. The judge also offered to reset the case if Valdes was unable to get the nurse there that day. The offense report was not admitted into evidence and is not included in the trial record.

After lunch, the State called a pretrial services officer in rebuttal. The officer testified that Esparza told him that he had, in the past, been employed by Valdes. After this, both parties rested. Valdes neither called the nurse to testify nor requested additional time.

The jury found Esparza guilty of aggravated sexual assault and sentenced him to imprisonment for life.

### Appeal and Habeas Corpus Proceedings

Esparza appealed. The First Court of Appeals in Houston affirmed his conviction but reversed his sentence and remanded the case for a new punishment hearing.[2] On remand, Esparza was again sentenced to life imprisonment. The Fourteenth Court of Appeals in Houston affirmed his sentence.[3]

Esparza sought state habeas relief, and we denied his application for a writ of habeas corpus on the findings of the trial court without a hearing.

Esparza filed a federal petition for a writ of habeas corpus in the United States District

---

[2] *Esparza v. State*, No. 01-95-00182-CR, 1996 Tex. App. LEXIS 3081 (Tex. App.—Houston [1st Dist.] July 18, 1996) (not designated for publication).

[3] *Esparza v. State*, No. 14-97-00440-CR, 1999 Tex. App. LEXIS 5642 (Tex. App.—Houston [14th Dist.] July 29, 1999, pet. ref'd) (not designated for publication).

Court for the Southern District of Texas. The district court denied relief, and Esparza filed a motion for a certificate of appealability in the Unites States Court of Appeals for the Fifth Circuit. The court of appeals denied Esparza's motion for a certificate of appealability. Esparza then filed a petition for certiorari in the United States Supreme Court, which was denied.[4]

## Chapter 64 Proceedings

In 2003, Esparza filed a pro se motion for post-conviction DNA testing, with an accompanying sworn affidavit, under Chapter 64, Texas Code of Criminal Procedure.[5] Esparza claimed that:

- the evidence was never subjected to DNA testing;
- through no fault of his own, the evidence was not tested, and such testing would show that he is innocent;
- if the evidence is subjected to testing, there would be no retrial because testing would show that he is innocent; and
- DNA testing is necessary to establish his innocence.[6]

The State filed a motion opposing Esparza's request.[7] The State maintained that the rape kit and clothing collected from Rios is in possession of Harris County Sheriff's Office. The rape-kit evidence includes: (1) vaginal swabs and slides; (2) oral swabs and slides; (3)

---

[4] *Esparza v. Dretke*, 543 U.S. 1158 (2005).

[5] *See* TEX. CODE CRIM. PROC. ANN. art. 64.01(a) (Vernon 2006) (last amended by Acts 2003, 78th Leg., ch 13, § 13, eff. Sept. 1, 2003).

[6] *See* TEX. CODE CRIM. PROC. ANN. art. 64.01(b).

[7] *See* TEX. CODE CRIM. PROC. ANN. art. 64.02 (Vernon 2006) (Added by Acts 2001, 77th Leg., ch. 2, § 2, eff. April 5, 2001).

a vial of blood; (4) a blood-stain card; and (5) a fabric cutting. The State therefore conceded that evidence still exists and is in a condition that makes DNA testing possible.[8]

But the State asserted that Esparza failed to show, by a preponderance of the evidence, that he would not have been convicted if exculpatory evidence had been obtained through DNA testing.[9] In support, the State cited the conversation that took place between Valdes, Esparza's trial attorney, the prosecutor, and the trial judge in which Valdes stated that, based on the offense report, Rios reported having "sex" a day or two before she was assaulted. The State also attached an affidavit from the trial prosecutor verifying that Rios had reported having "sexual relations two days prior to the incident." Because Rios had sex two days before the offense, the State argued that, if Esparza's DNA is not found on any of the biological evidence and some unknown third party's DNA is, then the seemingly favorable results would not be exculpatory. In the State's view, "[a]ny DNA not contributed by [Esparza] could be attributed to the person with whom the complainant had sex prior to the offense . . . ."

Without holding a hearing, the trial judge denied Esparza's motion, stating, in part:

- "Rios reported that she had sexual relations two days prior to the sexual assault . . . ."
- "Esparza fails to show by a preponderance of the evidence that he would not have been convicted of the offense of sexual assault . . . even if DNA testing

---

[8] *See* TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(1)(A) (Vernon 2006) (Added by Acts 2001, 77th Leg., ch. 2, § 2, eff. April 5, 2001 and amended by Acts 2003 78th Leg., ch. 13 § 3, eff. Sept. 1, 2003).

[9] *See* TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(2)(A).

would have produced results indicating that [Esparza] did not contribute the biological matter found in the physical evidence because [Rios] had sexual relations two days prior to the sexual assault offense."

• "[Esparza] fails to meet the requirement of Article 64.03(a)(2) of the Texas Code of Criminal Procedure concerning his burden of proof."

Esparza appealed the trial judge's ruling to the First Court of Appeals. He claimed that the trial judge erred in finding that he had not met his burden under Article 64.03(a)(2)(A).[10] That provision requires a convicted person seeking DNA testing to show, by a preponderance of the evidence, that "a reasonable probability exists that the person would not have been convicted if exculpatory results had been obtained through DNA testing."[11]

The court of appeals upheld the trial judge's ruling for two reasons.

First, the court rejected Esparza's claim that his case is governed by our decision in *Smith v. State*.[12] In *Smith*, we held that Smith was entitled to DNA testing because he showed that a reasonable probability exists—at least a 51% chance—that such testing would establish his innocence if the results proved to be favorable.[13] Fourteen years after he was convicted of aggravated rape, Smith filed a Chapter 64 motion for DNA testing.[14] The trial judge denied Smith's request, and the court of appeals affirmed the ruling, concluding that

---

[10] *Esparza*, 264 S.W.3d at 83, 87.

[11] T EX. CODE CRIM. PROC. ANN. art. 64.03(a)(2)(A).

[12] *Esparza*, 264 S.W.3d at 88-89.

[13] 165 S.W.3d 361, 364-65 (Tex. Crim. App. 2005).

[14] *Id*. at 361.

Smith failed to allege sufficient facts in his motion.[15] On discretionary review, we determined that the court of appeals erred, reversed its decision, and remanded the case to the trial court to order DNA testing.[16] At trial, the State used the presence of seminal fluid to establish the rape.[17] We recognized that, if Smith's DNA did not match the seminal fluid obtained during the victim's rape exam, which was conducted eight hours after she was attacked, then the results would be exculpatory.[18] The State argued that DNA testing would not necessarily yield exculpatory results because it was possible that: (1) the victim had sexual intercourse with her live-in boyfriend twenty-four hours before the attack, and (2) the attacker left no seminal fluid.[19] We rejected both of these arguments.[20] First, there was no evidence in the record indicating that the victim had sexual intercourse with anyone other than her attacker twenty-four hours before the rape exam.[21] And second, the evidence showed that the attacker left seminal fluid during the attack.[22]

Distinguishing *Smith*, the court of appeals in this case determined that the presence

---

[15] *Id.* at 361-63.

[16] *Id.* at 364.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.* at 364-65.

[21] *Id.*

[22] *Id.*

of biological evidence not belonging to Esparza would not necessarily be exculpatory.[23] Although the court observed that the assailant told Rios that he had ejaculated, the court determined that Esparza's attorney told the trial judge that the evidence would not "clear" Esparza.[24] The court further noted that, unlike *Smith*, where there was no evidence of a previous sexual encounter, the police report stated that Rios had sex a day or two before the assault.[25] The court further observed that the prosecutor's affidavit verified that the police report contained Rios's disclosure that she had sex two days before the offense.[26]

Second, the court determined that there is sufficient evidence, apart from any DNA evidence, establishing that Esparza assaulted Rios.[27] In reaching this conclusion, the court relied on Lucero's and Cantu's identification of Esparza.[28]

Based on the foregoing, the court concluded that Esparza "failed to establish, by a preponderance of the evidence, that he would not have been convicted if favorable DNA results had been obtained through the requested testing."[29]

---

[23]  264 S.W.3d 88-89.

[24]  *Id.*

[25]  *Id.*

[26]  *Id.*

[27]  *Id.* at 89 (citing *Johnson v. State*, 183 S.W.3d 515, 520 (Tex. App.—Houston [14th Dist.] 2006, pet. dism'd)).

[28]  *Id.*

[29]  *Id.*

Justice Bland dissented.[30] She maintained that the majority's reading of Article 64.03(a)(2)(A) is incorrect because the statute requires courts, in deciding whether testing should be conducted, to assume that testing would yield exculpatory results.[31] Justice Bland determined that our decision in *Smith* case is controlling:

> This case is similar to *Smith* in that: (1) no evidence exists in the convicting court record or this record that the complaining witness had sex with anyone else in the 24 hours before she was assaulted; (2) the complaining witness testified that the seminal fluid of her attacker was present after the rape; and (3) a rape kit done almost immediately after the assault recovered seminal fluid.[32]

And assuming that Rios had sex twenty-four hours before she was attacked, Justice Bland stated that Rios's previous sexual encounter "is too remote from the offense to conclude that DNA test results from evidence obtained after the offense would carry no evidentiary value." Like the evidence in *Smith*, "the DNA recovered after the attack in this case is more likely than not to belong to the attacker."[33]

### Esparza's Petition for Discretionary Review

We granted Esparza's petition for discretionary review to determine whether: (1) the court of appeals's decision conflicts with our decision in *Smith*, and (2) the court of appeals erred in concluding that Esparza failed to show, by a preponderance of the evidence, that he

---

[30] *Id.* at 89-90 (Bland, J., dissenting).

[31] *Id.* at 89 (Bland, J., dissenting).

[32] *Id.* at 90 (Bland, J., dissenting).

[33] *Id.* (Bland, J., dissenting).

would not have been convicted if exculpatory results were obtained through DNA testing.

In his petition and brief, Esparza argues that the court of appeals made inappropriate assumptions about the evidence that the record does not support. He asserts that there is no evidence establishing that semen or seminal fluid was left in Rios's vagina as a result of having sex two days before she was attacked. For instance, Esparza opines that it is unknown whether Rios's partner was male. But even assuming that her partner was male, Esparza contends that it is unknown whether he used a condom or ejaculated inside Rios. Esparza further claims that Rios's personal hygienic rituals are unknown; she may have douched after having consensual sexual intercourse. As a result, Esparza contends that Justice Bland's reliance on our *Smith* case is correct and that he has satisfied his burden under Article 64.03(a)(2)(A).

Holding to its previous position, the State argues that there is no evidence in the record indicating that any DNA evidence recovered from Rios would belong to her assailant because Rios had consensual sex with someone other than Esparza two days before she was assaulted. Therefore, any DNA testing that showed the presence of DNA belonging to someone other than Esparza does not raise a reasonable probability that he would not have been convicted.

**Analysis**

Reviewing courts defer to a trial judge's findings of fact when they are supported by

the record.[34] They also defer to a trial judge's application of law to fact questions when those questions turn on credibility and demeanor.[35] Finally, pure legal issues are given a de novo review by appellate courts.[36]

We begin by addressing the first reason that the court of appeals employed to uphold the trial judge's denial of Esparza's motion for DNA testing—that any DNA testing would show the presence of a third party's DNA and therefore prevents Esparza from satisfying his burden under Article 64.03(a)(2)(A). Contrary to the conclusion reached by the trial judge and court of appeals, Rios's prior sexual encounter does not preclude Esparza from establishing that, by a preponderance of the evidence, he would not have been convicted if DNA testing yielded exculpatory results.[37] This case is indeed similar to *Smith*. The record establishes that Rios's attacker deposited semen or seminal fluid inside Rios during the assault. However, the lack of evidence surrounding the facts and circumstances of Rios's sexual encounter two days before she was attacked does not support the conclusion that DNA evidence recovered from Rios would belong to someone other than Esparza. There is no evidence showing that Rios's partner deposited semen or seminal fluid inside of her vagina during the encounter. Nor does the record reveal whether Rios douched after having sex.

---

[34] *Smith*, 165 S.W.3d at 363; *see also Whitaker v. State*, 160 S.W.3d 5, 8 (Tex. Crim. App. 2004) (citing *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002)).

[35] *Id.*

[36] *Id.*

[37] *See* TEX. CODE CRIM. PROC. ANN. 64.03(a)(2)(A).

Third, and most importantly, there is no scientific evidence supporting the contention that biological material (semen or seminal fluid) deposited two days before Rios was sexually assaulted would still be present inside Rios and detectable when the rape kit was conducted.[38] The parties and the lower courts incorrectly assumed that such specific scientific knowledge is both common and customarily accepted. Because the record is deficient in various respects, the court of appeals erred in affirming the trial judge's finding that Rios's sexual encounter two days before the assault forecloses Esparza from satisfying his burden under Article 64.03(a)(2)(A).

Examining the court of appeals's second reason for upholding the trial judge's ruling—that there is sufficient evidence, besides DNA evidence, to establish guilt—we hold that this decision conflicts with our unanimous opinion in *Blacklock v. State*.[39] We issued *Blacklock* approximately a month after the court of appeals's opinion in this case.[40] In that case, the trial judge denied Blacklock's motion for DNA testing reasoning, in part, that, because the victim knew and identified her attacker, Blacklock failed to meet his burden under Article 64.03(a)(2)(A).[41] The court of appeals affirmed, holding that Blacklock failed

---

[38] *See e.g., Ex parte Reed*, 271 S.W.3d 698, 705-06, 712, 745, 750 (Tex. Crim. App. 2008).

[39] 235 S.W.3d 231 (Tex. Crim. App. 2007).

[40] *Id.*

[41] *Id.* at 232.

to allege sufficient facts in his motion.[42]  We reversed and remanded the case to the trial court.[43]  In doing so, we held that Blacklock's factual allegations were sufficient.[44]  Because Blacklock sought testing of biological evidence left by a lone assailant, we concluded that "exculpatory DNA test results, excluding [Blacklock] as the donor of this material, would establish [his] innocence."[45]  For purposes of construing Blacklock's motion, we found it irrelevant that the victim knew Blacklock and identified him as her attacker.[46]

Adhering to *Blacklock*, we hold that Lucero's and Cantu's eye-witness identification of Esparza is of no consequence in considering whether Esparza has established that, by a preponderance of the evidence, exculpatory DNA tests would prove his innocence.  In sexual assault cases like this, any overwhelming eye-witness identification and strong circumstantial evidence (e.g., Esparza's business card, light-blue, four-door car, age, and the fireworks on the floorboard) supporting guilt is inconsequential when assessing whether a convicted person has sufficiently alleged that exculpatory DNA evidence would prove his innocence under Article 64.03(a)(2)(A).[47]

## Conclusion

---

[42] *Id.*

[43] *Id.* at 233.

[44] *Id.* at 232.

[45] *Id.*

[46] *Id.* at 233.

[47] *Id.*

The court of appeals's judgment is reversed because Esparza has shown a reasonable probability that he would not have been convicted if exculpatory results had been obtained through DNA testing. We reverse and remand this case to the trial court for proceedings consistent with this opinion.

DATE DELIVERED: May 13, 2009
PUBLISH