

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-09-403-CR

ANTHONY TROY LOCKETT                                        APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In two issues, Appellant Anthony Troy Lockett appeals the denial of his postconviction request for forensic DNA testing.  We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

## II.  Factual and Procedural History

### A.  Trial and Appeal

On July 29, 1996, a jury convicted Lockett of murder, and the trial court sentenced him to forty years' confinement.  On October 16, 1997, after reviewing the legal and factual sufficiency of the evidence to support his conviction, we affirmed it.  *See Lockett v. State*, No. 02-96-00458-CR, slip op. at 10 (Tex. App.—Fort Worth Oct. 16, 1997, pet. ref'd) (not designated for publication).  To provide context for our discussion below, we briefly summarize the facts as revealed by the record in this case and our prior opinion.

On May 30, 1994, Lockett, who had spent the day drinking with his friend Lance Boyer, told Boyer that he could arrange for them to have group sex with Lockett's girlfriend, Joann Wolfe.  Lockett called Wolfe and, without informing her of their intent, asked her to pick them up at Boyer's trailer, and she did so.  During the return to her apartment, Wolfe and Lockett argued, and when they arrived, she jumped from her car, ran into her apartment, and locked the front door.  Undeterred, Lockett scaled the exterior wall to the second story balcony, entered Wolfe's apartment, and let Boyer in the front door.  When the argument resumed, Lockett grabbed Wolfe, shook her, and hit the back of her head against the wall.

Boyer did not see Lockett cause a wound that drew blood from Wolfe's frontal scalp, but he left the apartment when Lockett slapped him for trying to intervene. When he returned ten to fifteen minutes later, Lockett was sitting on the bed, and Wolfe had locked herself in the bathroom. He saw blood in the living room that he had not noticed before. At Wolfe's request, Boyer put her gown and car keys where she could reach them under the bathroom door. Thirty seconds later, Wolfe, with blood on her face, ran out of the apartment, down the stairs, through the breezeway, and across the parking lot as Boyer watched.[2]

Lockett wiped blood from the kitchen wall with his shirt, telling Boyer that he "didn't want to make it look as bad as it seemed." Boyer helped him, wiping blood from the kitchen pantry door. Lockett cleaned himself up and they left the apartment. He told Boyer that "he felt bad and he lost control."[3] Around 3 a.m., after he and Boyer split up, Lockett was arrested for public intoxication in the car lot of a nearby dealership.[4]

---

[2]... Boyer admitted that his vision was blurry at around fifteen feet and that he was not wearing his glasses that night.

[3]... Lockett's specific words to Boyer were that he had "fucked up."

[4]... An officer stated that an apartment resident told him that, in the early morning hours, some unknown individuals who did not match Lockett's or Boyer's descriptions knocked on her door and her neighbors' doors. When the resident saw these individuals, Lockett was already in police custody for public

3

About 6 a.m., Wolfe's body was discovered face-down underneath a stairwell in the breezeway of the apartment building across the parking lot from her apartment. She was wearing a gown and clutching her car keys. The medical examiner, who had initially declared that Wolfe died from hypertension or cardiovascular disease, ruled that her death was a homicide after he spoke with investigating officers. Specifically, he opined that she died from a closed head injury due to a blunt force trauma, which was a result of the frontal laceration on her scalp that caused her brain to swell.

Many items of physical evidence were collected from Wolfe's apartment,[5] and some had what appeared to be blood on them although no DNA testing was conducted, blood-type testing revealed that the blood that could be classified as human and typed was Wolfe's Type O blood, and not Lockett's Type A blood. A pink towel found in Wolfe's bathroom contained both Type O and Type B blood stains.

intoxication.

[5] ... In Wolfe's apartment, investigating officers found blood on a wall above a picture, on a wall in the living room, and on the floor, and they found a blood-soaked and torn navy blue dress in the bedroom. Wolfe's oven had been left on with some chicken legs inside, making the apartment smoky, and there were flowers on the bar area and various sets of wine glasses displayed. The officers also found four blood transfer stains, which occur when blood on one object touches another object, on the wall behind where Wolfe's body was found.

4

B.  DNA-Testing Hearing

After this court conditionally granted Lockett's pro se petition for writ of mandamus seeking to have the trial court rule on his motion for DNA testing,[6] the trial court held a hearing in September 2009.  At this hearing, Lockett's counsel requested a DNA test on the pink towel.  The trial court denied this request as it had denied Lockett's earlier request in November 2003, and it adopted the State's proposed findings of fact and conclusions of law.

1.  Findings of Fact

The trial court made the following pertinent fact findings:

1.  The defendant was convicted by a jury of the offense of murder, and was sentenced to forty years' confinement on August 27, 1996.

. . . .

3.  The Court denied the defendant's [November 3, 2003] motion on the grounds that identity was not an issue since the defendant admitted causing Joann Wolfe's head injury when he knocked her into the edge of the kitchen wall, and that the defendant would be unable to establish that he would not have been convicted if DNA testing was done given the substantial evidence of guilt.

. . . .

---

[6] See *In re Lockett*, No. 02-08-00452-CV, 2009 WL 1740145 (Tex. App.—Fort Worth June 16, 2009, orig. proceeding) (mem. op.).

6. On September 9, 2009, the Court heard arguments on the merits of the defendant's [2008] request for forensic DNA testing.

7. During that [September 9, 2009] argument, the defendant limited his request to the pink towel found on the floor of the bathroom in Jo[ann] Wolf[e]'s apartment.

8. The defendant's identity was not or is not an issue in this case because he caused Ms. Wolfe's head injuries in the presence of a witness, Lance Boyer.

9. Joann Wolfe became angry at the defendant while driving him and Boyer to her apartment.

10. When Ms. Wolfe arrived home, she ran upstairs and locked the defendant and Boyer outside.

11. The defendant climbed up the balcony to Ms. Wolfe's apartment and forced his way inside, and then let Boyer inside.

12. The defendant and Ms. Wolfe resumed argument, which escalated into a fight.

13. The defendant soon overpowered Ms. Wolfe and began to choke her.

14. Boyer saw the defendant shake Ms. Wolfe and hit the back of her head against the wall.

15. After a failed intervention, Boyer left the apartment and abandoned Ms. Wolfe to the defendant's attack.

16. When Boyer returned ten or fifteen minutes later, Ms. Wolfe was locked in the bathroom and the defendant was sitting on the bed.

17. After obtaining her gown and car keys from Boyer, Ms. Wolfe ran out of the apartment.

18. Even with his poor vision, Boyer saw blood on Ms. Wolfe's face.

19. Inside the apartment, the defendant began cleaning up the mess created by the beating, including wiping blood off the kitchen wall.

20. The defendant told Boyer that he didn't "want to make it look as bad as it seemed."

21. Ms. Wolfe was discovered sometime before 6:00 a.m. in a breeze-way approximately fifty yards from her apartment.

22. Ms. Wolfe was clutching her set of car keys in her lifeless hand.

23. Ms. Wolfe's bare feet were fairly clean suggesting to the police that she had not walked far.

24. In contrast to Ms. Wolfe's apartment, very little blood was found in the breeze-way near her body—meaning that the fatal wound was not inflicted in the breeze-way; and no blood was found on the railing near her body.

25. The defendant admitted to Boyer that he felt "bad" and had "lost control."

26. There is no evidence that Ms. Wolfe's alleged "real" attacker was injured.

27. Forensic DNA testing would not exonerate the defendant given the facts detailed above since there was no opportunity for the defendant to leave his DNA.

28. The defendant has not demonstrated by a preponderance of the evidence that forensic DNA testing would establish his innocence. [Internal citations omitted.]

7

## 2. Conclusions of Law

The trial court concluded that identity was not an issue because Lockett caused Wolfe's head injury in Boyer's presence and that, "[g]iven the substantial evidence that [Lockett] caused Ms. Wolfe's head injury," Lockett could not demonstrate by a preponderance of the evidence that forensic DNA testing would establish his innocence.

## III. Motion for DNA Testing

Lockett complains that the trial court erred by denying his request for postconviction forensic DNA testing of the pink towel found in Wolfe's apartment.

## A. Standard of Review

We employ a bifurcated standard to review a trial court's decision to deny a motion for DNA testing, affording almost total deference to the trial court's determination of issues of historical fact and application-of-law-to-fact issues that turn on credibility and demeanor and reviewing de novo other application-of-law-to-fact issues that do not turn on credibility and demeanor. *See Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002).

## B. Texas Code of Criminal Procedure Article 64.03

The trial court must order DNA testing only if statutory preconditions are met. *Bell v. State*, 90 S.W.3d 301, 306 (Tex. Crim. App. 2002). Here,

Lockett had to show (1) that identity was an issue in the case and (2) that, by a preponderance of the evidence, he would not have been convicted if exculpatory results had been obtained through DNA testing.[7] *See* Tex. Code Crim. Proc. Ann. art. 64.03(a)(1)(B), (a)(2)(A) (Vernon 2006). The requirement that identity be an issue in the case is not satisfied simply by a plea of not guilty. *Prible v. State*, 245 S.W.3d 466, 470 (Tex. Crim. App.), *cert. denied*, 129 S. Ct. 54 (2008); *see* Tex. Code Crim. Proc. Ann. art. 64.03(a)(1)(B). And if DNA testing would not determine the identity of the person who committed the offense or would not exculpate the accused, then article 64.03(a)(2)(A)'s requirement has not been met. *Prible*, 245 S.W.3d at 470; *see also Smith v. State*, 165 S.W.3d 361, 364 (Tex. Crim. App. 2005) (reciting article 64.03's legislative bill analysis, which states, "The defendant must prove that, had the results of the DNA test been available at trial, there is a 51% chance that the defendant would not have been convicted.").

C. Analysis

At issue is whether the identity of the person who caused Wolfe's death was in question and whether a DNA test of the pink towel could establish by a preponderance of the evidence that Lockett would not have been convicted.

---

[7] Article 64.03's other requirements are not at issue in this appeal.

Lockett argues that identity is an issue in this case because he did not confess to the killing and because he was in custody three hours prior to the discovery of Wolfe's body. His theory is that

> after Boyer and [Lockett] left, Wolfe changed clothes at least twice,[8] prepared chicken, placed it in the oven, placed wine glasses out and an array of flowers on the kitchen bar, changed into a blue dress, bloodied it somehow, tore one strap off somehow, ripped off eight buttons somehow, changed out of the blue dress and into a white gown with a flower print design, left the apartment for whatever reason and died in front of apartment Number 1814, in the breezeway of Building 18, sometime just before 6:00 A.M. During this period of time someone in her bedroom bathroom was bleeding on her blood (the blood mixed and fresh enough to test[]) and that person was type "B" blood.

He contends that the Type B blood on the pink towel indicates the presence of another bleeding individual inside the apartment on the night of the murder and that testing the Type B blood could lead to identification of that other person or at least point to another person "unknown in identity" sufficient to "suggest a fairly high probability that someone else murdered the deceased." Lockett proposes that adding the DNA evidence to the circumstantial evidence of his innocence would result in a likelihood of a not-guilty verdict.[9] We disagree.

---

[8]... Lockett relies on Boyer's testimony that he thought Wolfe was wearing pants when she came to pick them up at his trailer. But Boyer's testimony is first that he did not remember what Wolfe was wearing, followed by "I believe she was wearing pants. It has been so long."

[9]... Lockett lists the following as circumstantial evidence of his innocence: (1) the way Wolfe died, (2) what she was wearing when she was found,

10

First, contrary to Lockett's assertion that Wolfe's body was not in the breezeway until after 5:30 a.m. and after he was already in police custody,[10] Mark Coles, a resident of the apartment building with the breezeway where Wolfe was found and who gave the testimony that Lockett relies on, testified as follows:

> Q. Okay. And did—When did you tell the police about this [seeing Lockett enter Wolfe's apartment through the balcony]?
>
> A. I told the police the following day because *I went to work the next morning, and I didn't see anyone around*. And when I came home, that is when I saw the police. And I said, well—I asked someone what had happened. And they said the girl in the upstairs apartment had been found murdered outside the breezeway.
>
> And I said, "Well, I think I saw who did it." And so I went and told the apartment complex manager, and she said[, "Y]ou

---

(3) what time her body was found, and (4) that he was in custody three hours before her body was found.

The State lists the following as evidence that substantiates Lockett's guilt: (1) that he forced his way into Wolfe's apartment, (2) that he caused her fatal injuries in Boyer's presence when he choked, shook, and hit her, (3) that she was bleeding on her face when she left the apartment, (4) that Lockett attempted to clean up the mess created by the beating by wiping blood off the kitchen wall, (5) that Wolfe's body was found approximately fifty yards from her apartment in a breezeway, and (6) that Lockett admitted to Boyer that he lost control and caused Wolfe's injuries.

[10]... Lockett argues that he "was in custody a full three (3) hours before the deceased body was discovered in an area frequented by others who said the body was not there until after 5:30 A.M. local time, long after [he] was in police custody."

better go talk to the police.["] And I talked to a couple of policemen and told them my story.

Q. *When you went out to your car, you had to leave that morning. Did you see a body?*

A. *No sir.*

. . . .

Q. . . . What time did you go to work the next day?

A. *I went to work at 5:30 in the morning.*

Q. You were in the upstairs apartment, correct?

A. Yes, sir.

Q. *When you went down the stairs, did you look behind you underneath the stairs?*

A. *No, sir, I did not.*

Q. *Would it have been possible for someone to have been standing there and you not have seen them*?

A. Going down the steps?

Q. Yes, sir.

A. *Yes, sir, probably so, because going down the steps, I rarely look back behind me.*

Q. Where was your car parked out down the stairs?

A. Out in front.

Q. And you walked out to your car—Was it parked directly in front of that breezeway, or down one or two—

12

A.  It was down—down toward the left side of the breezeway.

Q.  *So when you turned around, I would assume to get in your car, you wouldn't have been able to see underneath the staircase anyway?*

A.  *No, sir.*

Q.  *And you didn't look to begin with?*

A.  *Exactly.*

[Emphasis added.] Other testimony at trial revealed that when Wolfe's body was discovered around 6 a.m., it was discovered underneath the stairwell in the breezeway.  Coles's testimony is consistent with Wolfe's body having already been in the breezeway before Lockett was taken into custody around 3 a.m.

Additionally, in a statement to the police that was read to the jury, Lockett described his altercation with Wolfe as follows:

> We had only been there [at Wolfe's apartment] about 30 minutes when Joann got mad.  I don't know for sure what she was mad about.  I think she [got] mad because [Boyer] was with me.  Me and Joann got into a shoving match in the living room.  She shoved me and I shoved her.
>
> *We were standing in the living room next to the kitchen when I shoved Joann.  She hit her head on the edge of the kitchen wall, and her head started bleeding and she sat down on the floor.*  Joann immediately got up and walked out the front door.  Joann was mad at me and had been telling me to leave before we got into the pushing match.  And after we got into the pushing match and

13

she hit her head, I figured I would end up going to jail for assault so me and [Boyer] left.

Before we left we saw Joann walk to the apartment building directly across from her apartment. And I saw her go inside one of the apartments on the left downstairs.

. . . .

I did not kill Joann. She was alive at the neighbor's apartment when I left. [Emphasis added.]

Therefore, although Lockett accurately complains that he did not confess to murder when he put "I did not kill Joann" into his statement to the police, other parts of his statement—particularly his admission that he caused a bleeding head injury—in light of the medical examiner's testimony and the photographic exhibits that indicate the only laceration that Joann suffered that night was a bleeding head injury, weigh against his argument that DNA-testing would exculpate him.

Finally, contrary to Lockett's assertion that "[b]lood type 'B' was found on numerous items including the pink towel," of the items at trial, the pink towel is the only item that clearly has both types. And while many of the items had what appeared to be blood on them and some actually had Type O blood on them, others were ruled not positive for blood, positive for blood but unable to be blood-typed, or positive for blood but unable to confirm whether the blood was human.

14

In sum, Lockett's position is simply that someone else caused the injuries to Wolfe that resulted in her death: Identity is an issue because someone else did it, and he would probably have been found innocent because someone else did it. However, Lockett has not shown a reasonable probability that the requested DNA test would prove his innocence because, assuming the blood typing tests were done correctly, there was already evidence before the jury of the presence at some point of a hypothetical third person in the apartment. The timing of this presence is unknown. What is known is that an altercation occurred in the apartment which, in Boyer's presence, included Lockett choking Wolfe and slamming her head against the wall. After Boyer's ten-to-fifteen-minute absence, during which the fight between Lockett and Wolfe continued, Boyer returned to witness blood in the living room and in the kitchen and blood on Wolfe's face as she fled the apartment. And the medical examiner testified that blunt force trauma resulted in the laceration that caused Wolfe's death. Other than an unexplained Type B blood spot on the pink towel,[11] there is no other direct evidence of the presence of anyone besides Lockett, Boyer, and

---

[11] ... Boyer's blood type was not entered in evidence.

Wolfe inside the apartment that night, and no evidence at all that the "donor" of this blood was the murderer.[12]

Considering Lockett's allegations in light of the facts of this case, we conclude that the trial court did not err by denying Lockett's motion because Lockett failed to meet his burden under article 64.03(a)(1)(B) and (a)(2)(A). *See* Tex. Code Crim. Proc. Ann. art. 64.03(a)(1)(B), (a)(2)(A); *Prible*, 245 S.W.3d at 470 ("Evidence of another person's DNA in addition to Appellant's is not exculpatory evidence in this case due to the additional evidence presented at trial. Thus, even if the evidence was retested and determined to contain another person's DNA . . . , it would not establish by preponderance of the evidence that Appellant would not have been convicted if the jury had heard that DNA from a third-party was present.") (citation omitted); *see also Bell*, 90 S.W.3d at 306 (considering an appellant's due process claim and reasoning that, without more, the presence of another person's DNA at the crime scene will not constitute affirmative evidence of an appellant's innocence). *But see Esparza v. State*, 282 S.W.3d 913, 922 (Tex. Crim. App. 2009) (holding that,

_____

[12] ... As in many cases, some questions remain unanswered, including at what point Wolfe's body appeared in the breezeway behind the stairs of the other apartment building. Nevertheless, the jury found Lockett guilty, and this court has previously affirmed his conviction after performing both legal and factual sufficiency reviews. *See Lockett*, No. 02-96-00458-CR, slip op. at 2–6.

16

in sexual assault cases, any overwhelming eye-witness identification and strong circumstantial evidence supporting guilt is inconsequential when assessing whether a convicted person has sufficiently alleged that exculpatory DNA evidence would prove his innocence under article 64.03(a)(2)(A)); *Blacklock v. State*, 235 S.W.3d 231, 232–33 (Tex. Crim. App. 2007) (holding that appellant's motion for DNA testing fairly alleged and showed by preponderance of the evidence that the victim's lone attacker was the semen donor and that exculpatory DNA test results excluding appellant as the donor would establish his innocence).  We overrule both of Lockett's issues.

## IV.  Conclusion

Having overruled both of Lockett's issues, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 31, 2010