Frederick Wayne JOHNSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–04–00892–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 10, 2006.

516

Patricia Sedita, Houston, for appellant.

Peyton Peebles III, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices YATES and ANDERSON.

## OPINION

ADELE HEDGES, Chief Justice.

In February 1990, appellant, Frederick Wayne Johnson, was convicted of aggravated sexual assault of a child and sentenced to life in prison. In 2001, he filed a motion seeking DNA testing of biological evidence obtained during the investigation of the assault. The trial court ordered the testing and then held a hearing regarding the results. The trial court found that the results were "not favorable" to appellant under Chapter 64 of the Texas Code of Criminal Procedure. On appeal, appellant contends that the trial court erred in (1) considering new evidence filed by the State that was not presented in the original trial, and (2) finding that the results were not favorable. We affirm.

### *Background*

At trial, Rhonda Kelso testified that on August 31, 1988, she was walking toward her house when appellant tried to entice her to approach him, but she ignored him. Later upon leaving her house, she saw him again and hid her face behind her umbrella. When she returned home, she saw him a third time, and he grabbed her by the arm and told her "[C]ome here, I've got to tell you something." She managed to pull away and continue walking, but a short time later she heard a scream and turned around to see that appellant had grabbed a female and was pulling her into a building. The female said "okay, okay" but was trying to resist. Appellant steadily pulled her until they were in the building. Kelso found a telephone and called 911. She also asked a group of electrical workers for help and one of them called 911 as well. A police officer arrived, and Kelso asked one of the men she had asked for help to show the officer the correct building. He did so, and the officer entered the building and came out a few minutes later with appel-

lant and a girl. Kelso stated that she was able to "get a good look" at appellant when he exited the building in handcuffs. She identified appellant as the same man who had accosted her earlier and who had dragged the girl into the building.

The complainant testified that on August 31, 1988, she was sixteen years old. She was walking away from her house when appellant crossed the street and asked her if she knew where a particular street was located. She did not know and kept walking, and he walked the other way. She then felt like someone was following her, and she turned around to see appellant behind her. She screamed, and he grabbed her by the hair and pushed something to her back. He told her to stop screaming or he would kill her, and she stopped screaming. He then told her to walk across the street. She was terrified and tried to pull away, but he had a steady grip on her and took her inside an abandoned building to a room with a lot of glass and dirt on the floor. He again threatened to kill her and ordered her to take off her clothes. She took off her shorts and underwear; he told her to lie down on the floor and she did. Appellant fondled her breasts and then unzipped his pants and put his penis in her vagina. She was crying and felt scared. After about fifteen minutes, appellant told her to get up and that he was taking her to a house. She thought he was going to kill her. A uniformed police officer then walked into the room and handcuffed and arrested appellant. Complainant was taken home and then to the hospital where she was examined by a doctor, and a rape kit was prepared. She stated that she had never seen appellant before the day of the assault.

Officer Willie C. Curry, of the Houston Police Department, testified that on August 31, 1988, he responded to a call that a possible rape was in progress. When he

arrived at the scene, a man directed him to a particular building, and he parked his vehicle and entered the building with his weapon drawn. He heard a man's voice say "[N]ow we are going to go to my house." Officer Curry entered the room where the voice had come from as appellant and complainant were exiting. Curry told appellant to get down on the floor; he then handcuffed appellant and walked him out of the building. Appellant told Curry that complainant was his wife or girlfriend.

Dr. Robert Noel testified that he performed a physical examination of complainant on August 31, 1988. She had sand in her hair and on her shoulders, neck, and back. She had a small laceration on her back. In examining complainant's vaginal vault, he found sand, a string of blue textile material, and a white substance that resembled semen. He described finding the string in that location as being particularly unusual. All three of the prior witnesses, Kelso, complainant, and Curry, had testified that appellant was wearing a blue sweat shirt and blue warm-up pants on the day of the assault. In describing her attire on that day, complainant stated the color of each garment but did not identify any of them as being blue. Noel further testified that he asked complainant if she had had any sexual activity in the 72 hours prior to the examination, and she replied "no." Although Noel did not specifically testify that complainant told him that she had been sexually active in the past, his testimony suggests that she told him she had been. In explaining his procedures for such examinations, Noel stated that he first asks whether the patient has ever had sexual intercourse and then, presumably based on the answer, he asks whether the patient has had sexual intercourse in the prior 72 hours.

Cleva West, a serologist with the Houston Police Department Crime Laboratory, testified that she obtained a cutting from complainant's underwear and the vaginal swabs taken during the physical examination. She performed tests on those items and determined that semen was present on them.

Appellant did not testify at trial. No evidence was offered to suggest any reason why appellant would have been arrested by Officer Curry in the room of the abandoned building with complainant, other than that he was in fact the man that Kelso saw abduct complainant and whom complainant said raped her.

Pursuant to the trial court's order of October 28, 2002, Kristi P. Wimsatt, a criminalist with the Texas Department of Public Safety Laboratory in Houston, conducted DNA testing on the cutting from complainant's underwear, the vaginal swabs taken during her physical examination, and a sample of appellant's blood. The test results on the underwear cutting showed that the DNA in the semen stain did not match appellant's DNA. The test performed on the vaginal swab was unable to ascertain a DNA profile.

Also attached to the State's motion for findings of fact was an affidavit signed by complainant, in which she averred, among other things, that she had a boyfriend at the time of the assault and was sexually active during that period of time. However, she stated that she does not recall the exact date or time that she had sexual relations with her boyfriend prior to the assault. She further stated that she does not recall whether appellant ejaculated during the assault.

Additionally attached to the State's motion were the results of DNA testing conducted in 1989. These results indicated that the DNA found on the vaginal swabs matched appellant's DNA profile from a

blood sample. However, apparently owing to testing limitations of the time, the results state that the DNA on the swabs would match approximately 1 in every 325 members of the North American black male population and 1 in every 5,554 members of the North American white male population. The 1989 testing was unable to isolate a DNA profile on the underwear cutting for comparison. These results were not introduced in the original trial.

### New Evidence

■ In his second issue, appellant contends that the trial court erred in considering new evidence that was not presented in the original trial. Specifically, appellant argues that the court should not have considered the complainant's affidavit filed by the State. In his briefing of this issue on appeal, however, appellant provides no citation to the record or to authority. *See* Tex.R.App. P. 38.1(h) (requiring that appellant's brief must contain appropriate citations to the record and to authority). Accordingly, this issue is improperly briefed. *See Tong v. State*, 25 S.W.3d 707, 710 (Tex.Crim.App.2000) (holding that even a novel argument must be grounded in the relevant jurisprudential framework for evaluating the claim). Furthermore, in the trial court, although defense counsel urged the court not to consider the affidavit in making its decision, counsel never objected to the document, and the trial court never ruled on any such objection or argument.[1] Accordingly, this issue was not preserved for appellate review. *See* Tex.R.App. P. 33.1(b) (providing that to preserve error a party must make a timely and sufficiently specific request, objection, or motion and obtain a ruling thereon or object to the court's refusal to rule). Consequently, appellant's second issue is overruled.

### Results Not Favorable

■ In his first issue, appellant contends that the trial court erred in finding that the DNA test results were not favorable to him. Under the version of article 64.04 applicable at the time appellant filed his motion, once a trial court has ordered and received DNA testing results, the court must "hold a hearing and make a finding as to whether the results are favorable to the convicted person." Act of April 5, 2001, 77th Leg., R.S., ch. 2, § 2, 2001 Tex. Gen. Laws 2, *amended by* Act of Apr. 25, 2003, 78th Leg., R.S., ch.13, § 4, 2003 Tex. Gen. Laws 16.[2] Results are considered favorable under the article only if "had the results been available before or during the trial of the offense, it is reasonably probable that the person would not have been prosecuted or convicted." *Id.* The trial court specifically found that the DNA test results were not favorable to appellant under article 64.04.

■ We review the court's decision under a bifurcated standard, providing almost total deference to the court's determination of historical fact issues and application-of-law-to-fact issues that turn on credibility or demeanor, but reviewing de novo other issues involving the application

---

1. Indeed, the trial judge never indicated whether she intended to or did consider the affidavit in making her determination. Thus, we cannot infer that the court implicitly rejected defense counsel's arguments. *See* Tex. R.App. P. 33.1(b).

2. The 2003 amendment to article 64.04 "applies only to a convicted person who on or after the effective date of this Act [September 1, 2003] submits a motion for forensic DNA testing." Act of Apr. 25, 2003, 78th Leg., R.S., ch. 13, §§ 8, 9, 2003 Tex. Gen. Laws 16, 17; *see also Booker v. State*, 155 S.W.3d 259, 262 n. 2 (Tex.App.-Dallas 2004, no pet.). The changes affected by the amendment, however, appear grammatical in nature.

of law to facts. *Baggett v. State*, 110 S.W.3d 704, 706 (Tex.App.-Houston [14th Dist.] 2003, pet. ref'd). Although there may exist subsidiary fact issues that are reviewed deferentially, the ultimate question of whether a reasonable probability exists that exculpatory DNA tests would prove innocence is an application-of-law-to-fact question that does not turn on credibility and demeanor and is therefore reviewed de novo. *Id.* (citing *Rivera v. State*, 89 S.W.3d 55, 59 (Tex.Crim.App. 2002) (discussing article 64.03, not 64.04)).

■ In order to demonstrate a "reasonable probability" that he would not have been prosecuted or convicted, as required under article 64.04, appellant must show a reasonable probability that exculpatory DNA tests would prove his innocence. *Id.* (citing *Rivera*, 89 S.W.3d at 59). A reasonable probability of innocence exists when there is a probability sufficient to undermine confidence in the outcome. *Id.* (citing *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App.1999)). A reasonable probability of innocence does not exist if there is sufficient evidence, other than the DNA evidence in question, to establish guilt. *Id.* (citing *Rivera*, 89 S.W.3d at 60). Thus, a trial court does not err by finding DNA test results "not favorable" if the post-conviction results fail to demonstrate a reasonable probability of innocence in the face of other evidence that is sufficient to establish guilt. *Id.*

Here, the DNA test results demonstrate that appellant could not have been the source of the semen stain on the cutting from complainant's underwear. Although this evidence is certainly exculpatory in nature, we do not consider it in a vacuum. It must be evaluated in the context of the other relevant evidence, particularly: (1) the results of DNA testing on the vaginal swabs, (2) the unusually persuasive eyewitness testimony, and (3) the evidence that complainant was sexually active during the period of time in which the assault occurred.

The 2004 DNA testing was unable to isolate a DNA profile on the vaginal swabs taken during complainant's physical examination. Additionally, the DNA testing performed in 1989 found that appellant could in fact have been the source of the semen Dr. Noel observed in complainant's vaginal cavity. Thus, it is an open question, not answered by the 2004 testing, whether appellant was the source of the semen inside complainant's vaginal cavity but not the source of the semen on the underwear cutting.[3]

---

**3.** Appellant postulates that because semen was found in complainant's vaginal cavity, the stain on her underwear must have been caused by leakage of this same semen, and thus, it must have been from the same source. Although this is a possible conclusion, it does not appear to be the only possible conclusion; indeed, appellant provided no evidence, authority, or further reasoning in support of this conclusion. Further, complainant did not testify at trial that appellant ejaculated during the assault, and she stated in her affidavit that she did not remember if he ejaculated.

Additionally, the Court of Criminal Appeals opinion in *Smith v. State*, 165 S.W.3d 361 (Tex.Crim.App.2005), is distinguishable from the present case. In *Smith*, the Court reversed lower court rulings under article 64.03 and ordered DNA testing to be performed on biological material. 165 S.W.3d at 365. The State argued that because the victim lived with her boyfriend, the seminal fluid that was found during her physical examination may have been her boyfriend's and not her attacker's; thus, DNA testing would not be exculpatory, even assuming it did not match the defendant's DNA. *Id.* at 364. The court rejected this argument because (1) the victim testified at trial that her attacker left seminal fluid during the attack, and (2) there was no evidence that the victim had intercourse with anyone other than her attacker during the 24 hours preceding the exam. *Id.* at 364–65. In the present case, the DNA testing that excluded appellant as the source was not done on

Furthermore, the eyewitness testimony in this case was particularly compelling and in several respects less open to misidentification than in many cases based primarily on eyewitness testimony. Complainant's identification of appellant as her attacker was corroborated by other witnesses who saw appellant with complainant immediately before and immediately after the assault. As described in detail above, Kelso saw appellant three times that day in the same area in which he abducted complainant; indeed, she testified that appellant grabbed her as well, but she managed to get away. Kelso additionally testified that the man whom she saw being taken out of the building in handcuffs was the same man who had dragged complainant into the building. Officer Curry testified that he discovered appellant in a room of an abandoned building with complainant. Curry, therefore, did not arrest appellant well after the time of the offense based on a description provided by an eyewitness, as often occurs in eyewitness cases; he arrested appellant in a room where appellant was alone with the victim immediately after the assault. *Cf. Torres v. State*, 104 S.W.3d 638, 641 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd) (noting appellant was arrested at scene of the crime after loading stolen items in a vehicle). Taken together, the eyewitness testimony of Kelso, complainant, and Curry presents a seamless thread that renders the possibility of mistaken identity particularly slight.[4] Their testimony was also supported by physical evidence garnered after the assault, including, especially, the blue string discovered by Dr. Noel in complainant's vaginal cavity. Further, appellant offered no explanation at trial to explain why he was alone in the room with complainant.

Lastly, both complainant's affidavit attached to the State's motion and Dr. Noel's testimony at trial suggested that complainant was sexually active during the period of time in which the assault occurred. That provides an alternative explanation for the source of the semen stain on the underwear cutting. Based on our review of the evidence as a whole, we conclude that the DNA test results do not demonstrate a reasonable probability of appellant's innocence because there was sufficient other evidence to establish guilt. *See Baggett*, 110 S.W.3d at 706. Consequently, the trial court did not err in finding that the results were not favorable to appellant. Appellant's second issue is overruled.

We affirm the trial court's order.

---

the fluid found inside complainant's vaginal cavity but was performed on a stain found on her underwear, which could have been left more than 24 or even 72 hours earlier. Additionally, as mentioned above, there was no evidence that appellant ejaculated during the assault other than the presence of semen in complainant's vaginal cavity and only conjecture that the source of the semen on the underwear cutting was the same as the source of the semen in the vaginal cavity. For these reasons, the present case is distinguishable from *Smith*.

4. The similarity and consistency of details in the testimony of the three witnesses is remarkable, ranging from the description of the building to the description of appellant, his clothes, and his hairstyle.