# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00714-CR

### In re Tirone Clemons

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
NO. 104,673, HONORABLE BOB PERKINS, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

In 1991, a jury convicted Tirone Clemons of aggravated sexual assault of a child, a first-degree felony, and sentenced him to fifty years' imprisonment. In 2003, Clemons filed a motion for post-conviction DNA testing, and the trial court granted the motion and ordered the Texas Department of Public Safety to conduct testing. In 2006, Clemons filed a motion requesting a hearing regarding the results of the DNA testing pursuant to chapter 64 of the Texas Code of Criminal Procedure. The trial court held a hearing and concluded that the results of post-conviction DNA testing were "not exculpatory" and that if the results had been available during Clemons's trial, it was "reasonably probable that [he] would have been convicted." We affirm the trial court's order.

### BACKGROUND

At trial, the thirteen-year-old victim, W.S., testified that on the morning of April 25, 1990, when she was twelve years old, she was walking to school with a female friend when a man spoke to them from a car and offered them a ride. When they refused, the man got out of the

car and began chasing them. The man grabbed W.S.'s friend by the hand, but she broke away from him and continued running. He then grabbed W.S. by her arm and dragged her to his car. After forcing W.S. into the car, he got into the car and began driving. W.S. testified that she was "crying and screaming" and that the man grabbed her by the neck when she tried to get out of the car.

She testified that the man eventually stopped the car at a place where there were no houses. The man got out of the car, walked around to the side where W.S. was seated, and opened the door next to her. W.S. testified that she did not have her clothes on because the man "made [her] pull them off when he grabbed [her] by [her] neck." The man pulled his pants down, got on top of W.S., and attempted to put his "private" inside of her "private." He then stood up and told her that "it wouldn't go in." He took a red condom out of a package and put it on. He got back on top of W.S. and again attempted to penetrate her. After telling her that "it still wouldn't go in," the man got off of her, took the condom off, and threw it on the ground. He then "got on his knees and licked [her] privates." W.S. testified that the man then pulled up his pants, told her to pull up her pants, and drove her near her school, where he released her. She ran home.

Meanwhile, W.S.'s friend had run home and reported W.S.'s abduction to police. By the time W.S. arrived at her home, Officer Frederick Simpson was already there. He testified that W.S.'s friend had reported the abduction sometime between 7:00 a.m. and 8:00 a.m. that morning. Simpson interviewed W.S. and her friend and asked them to show him where W.S. had been abducted, which they did. Simpson then traveled with W.S. to the hospital.

While Simpson was driving with W.S. in the car, W.S. pointed to a Buick Riviera and said that the abductor's car looked similar to that car. At the hospital, W.S. provided Simpson with

a description of the man who abducted her, describing him as a black male with a thin build, a light complexion, and a moustache and beard. She also described him as being about five-feet-nine- or five-feet-ten-inches tall and wearing a blue work shirt and blue pants.[1] Also on the day of the crime, W.S. and her friend spoke with Officer John Hardesty and described the assailant's car as being a gray Buick Riviera.

Dr. Beth Nauert, a pediatrician, examined W.S. at the hospital. Nauert observed bruises and scratches in several areas of W.S.'s body. Nauert also observed an acute vaginal injury and testified that the injury was consistent with recent vaginal penetration. As part of her examination, Nauert also swabbed W.S.'s pubic area and combed it for foreign hairs.

Later that day, Officer Hardesty and other officers attempted to locate a car matching the description provided by W.S. and her friend. A few blocks from W.S.'s home, they found a gray Buick Riviera matching the girls' description. They determined that the car was registered to one of three brothers who lived together and all had access to the car. Police contacted the brothers and made arrangements for them to go to the police station the following morning. In the meantime, Officer Hardesty drove W.S. past the brothers' car to see if she recognized it. W.S. indicated that the car was not the same one driven by her assailant. She explained that her assailant's car was cleaner, shinier, and newer-looking than the Riviera. The following morning, the three brothers arrived at the police station, and officers took their photographs. At trial, W.S. testified that she was "absolutely sure" that none of the men was her assailant.

---

[1] Sergeant Michael Shane testified that later, in a videotaped interview, W.S. stated more specifically that the shirt her assailant wore was light blue and that some of the patches were ripped off.

In the days after the assault, Sergeant Michael Shane obtained more details from W.S. about where the assault occurred, and he drove W.S. on roads matching her description near where she was abducted. W.S. remembered that her assailant had driven her to a certain point on Ed Bluestein Boulevard, but she could not remember where he had turned after that. When Shane drove her to a nearby area, she recognized the area, saying, "This is where it happened." W.S. had previously described seeing a gate near the location of the assault, and at the location she identified, Shane observed a gate that was opened and propped against the trees on the side of the road. Shane testified that the gate would have been visible from the road if it had been closed. Once at the scene, Shane found a used red condom on the side of the road and collected it as evidence.

At some point, Clemons became a suspect in W.S.'s assault.[2] Approximately two days after the assault, police officers asked W.S. to go to the police station to attempt to identify her assailant among groupings of photos. Officers first gave W.S. books containing photos of possible suspects. W.S. looked at the photos but determined that her assailant was not among them. Officers then gave W.S. a six-person photo line-up that included Clemons's photo. W.S. identified Clemons as her assailant. At trial, W.S. again identified Clemons as her assailant. Also at trial, W.S. identified Clemons's Oldsmobile Toronado as the car driven by her assailant.

During the trial, the State presented evidence that later in the morning of W.S.'s assault, Clemons abducted a young woman from a bus stop and attempted to assault her in the same

---

[2] The only evidence in the record regarding how Clemons became a suspect was Sergeant Shane's testimony that there was a "family dispute between two individuals," and that the officer responding to the scene of the dispute noticed that one of the individuals involved in the dispute drove a car that matched W.S.'s description of her assailant's car.

location where he assaulted W.S.  The woman, T.S., who was twenty-one years old at the time of trial, testified that she was waiting at a bus stop at approximately 9:30 a.m. on April 25, 1990, when a man pulled his car to the side of the road in front of her and began talking to her.  The man told her that she "looked good" and asked her if she wanted a ride.  She told him she did not want a ride, but he continued asking.  Eventually, he got out of the car, picked up T.S.'s purse and umbrella, and threw them into his car.  He then grabbed her wrists and pulled her to his car while she pulled back, and he got behind her and pushed her in front of him into the car.

Once he was in the car and began driving, he repeatedly touched T.S.'s hair and shoulders while she pulled away from him.  He drove on Ed Bluestein Boulevard and turned onto a dirt road.  When he turned onto a second dirt road, T.S. opened her door to attempt to get out of the car.  The man grabbed her on her neck and clothes.  T.S. was screaming and kicking while he grabbed her.  During the struggle, he pulled off her shirt and jacket.  At some point, she got out of the car, and he picked her up from behind and put his hand over her mouth.  Eventually, she was able to grab her shirt and jacket and run from him.  She ran toward a man she saw sitting in a dump truck nearby.  The man let her climb into the truck, and her assailant drove away.  Her purse and umbrella were still in the assailant's car.  She testified that she had several important documents in her purse and that at the time of the offense, she had been applying for food-stamp benefits from the Texas Department of Human Services.

When T.S. went to the police station after reporting the incident, police showed her a six-person photo lineup that included Clemons, and she identified him as the man who abducted her.  At trial, she also identified Clemons as her assailant.  T.S. testified that her assailant had been wearing a light blue shirt and dark blue pants and that a patch had been torn off the shirt.

5

Several police officers went to Clemons's apartment to arrest him. Among the officers were Sergeant Shane and Officer Hardesty, who were each wearing jackets that said "Police" on the front and back. The officers watched from a distance as Clemons walked from his apartment to his car. When he reached his car, the officers began walking toward him. When Clemons saw them, he turned and ran back toward his apartment.[3] All of the officers chased after him and followed him into his apartment, where they apprehended him. In the apartment, officers found Clemons's wallet and numerous condoms, including one in his wallet.[4] In a hamper in the apartment, they found a light-blue shirt and a pair of blue pants. Sergeant Shane described the clothes as "work" clothes. Patches had been removed from the shirt. On his person, Clemons was carrying two documents from the Texas Department of Human Services made out in the name of T.S. and indicating that T.S. was eligible for food-stamp benefits.

At trial, a chemist from the Texas Department of Public Safety (DPS), Steve Robertson, testified regarding his analysis of several items, including the red condom, a piece of hair found in W.S.'s underwear, and carpet fibers from the interior of Clemons's car. He testified that he attempted to analyze a sample of semen found in the red condom but was unable to "type" the semen due to the quality of the sample. Regarding the hair recovered from W.S.'s underwear, Robertson testified that the hair did not match W.S. or Clemons. He testified that it was "unlikely"

---

[3] There is some evidence in the record suggesting that Clemons did not initially know that the men approaching him were police officers because some of them were not in uniform. Sergeant Shane testified at trial that he was told after the arrest that Clemons initially thought the officers were insurance salesmen.

[4] Although the record includes only black-and-white photos of some of the condoms found in Clemon's apartment, the index to the reporter's record describes one of the condoms as "pink." In Clemons's brief, he describes some of the condoms found in his apartment as "red."

that the hair was from Clemons but that he could not exclude Clemons as a possible source. Robertson also testified that he analyzed red carpet fibers taken from Clemons's car and red fibers removed from the clothing W.S. wore at the time of the assault. Based on his analysis, he determined that the fibers from Clemons's car matched the fibers found on W.S.'s clothing. He explained that he could not say for certain that the fibers found on W.S.'s clothing were from Clemons's car because the same fibers could be found in other cars, but his determination that the two sets of fibers matched each other meant that it was "possible" that the fibers on W.S.'s clothes were from Clemons's car.

After hearing all of the evidence at trial, the jury convicted Clemons of aggravated sexual assault of a child and sentenced him to fifty years' imprisonment. Clemons appealed his conviction to this Court, alleging that the evidence was insufficient to support his conviction and that the trial court erred in admitting evidence regarding the extraneous offense against T.S. In an unpublished opinion, this Court affirmed the trial court's judgment. *See Clemons v. State*, No. 03-91-00255-CR (Tex. App.—Austin Sept. 16, 1992, pet. ref'd) (not designated for publication), *available at* http://www.3rdcoa.courts.state.tx.us/opinions/HTMLopinion.asp?OpinionID=5501.

In 2003, Clemons filed a motion for post-conviction DNA testing, and the trial court granted the motion and ordered DPS to conduct testing. In September 2004, DPS conducted testing on the physical evidence gathered after the assault and issued a report regarding the results. In the report, DPS determined that Clemons was excluded as a contributor to the sperm found in the red condom and the vaginal and pubic swabs taken from W.S. The report also indicated that DPS had not done any testing using the DNA sample taken from W.S. because DPS could not obtain an

7

interpretable DNA profile from the existing sample. The same month that the report was issued, DPS compared the DNA in the sperm found in the condom with samples in a DNA database. The DNA taken from the sperm in the condom matched that of one of the men in the database.[5]

In 2006, Clemons filed a motion seeking a hearing regarding the results of the DNA testing pursuant to chapter 64 of the Texas Code of Criminal Procedure. Using updated DNA analysis techniques, DPS analyzed the evidence again in 2007. Orchid Cellmark, a DNA testing laboratory, also performed testing on a "vaginal swab/vaginal smear"[6] taken from W.S. In April 2008, the trial court held a hearing regarding the DNA results. At the hearing, the assistant director of DPS's crime laboratory, Brady Mills, testified that based on the new DNA-analysis techniques, some of the conclusions made in DPS's 2004 report remained the same but others did not. Mills testified that using the new testing, Clemons was still excluded as a contributor to the sperm found in or on the red condom. In addition, DPS had obtained a new DNA sample from W.S. and determined that she was also excluded as a contributor to any of the substances found on or in the condom. Mills therefore concluded that the red condom was not linked to W.S.'s assault.

Regarding the pubic and vaginal swabs, from which DPS had excluded Clemons as a contributor in its 2004 report, Mills testified that the new testing techniques would be reported as "inconclusive" rather than as excluding Clemons. A report from Orchid Cellmark indicated that the lab had tested a vaginal swab taken from W.S. and concluded that Clemons could not be excluded

---

[5] The record does not reveal anything further about the man in the database or whether DPS followed up with him after learning of the results.

[6] Orchid Cellmark combined a vaginal swab and vaginal smear into one sample for testing. For ease of reference, we will refer to the sample as a "vaginal swab."

as a contributor to the sample. The State also called an expert in the field of DNA testing, Arthur Eisenberg, to testify regarding DPS's and Orchid Cellmark's results. Eisenberg testified that the test results showed that Clemons could not be excluded as a possible contributor to the vaginal or pubic swabs taken from W.S.

After the hearing, the trial court issued findings of fact and conclusions of law, concluding that the results of post-conviction DNA testing were "not exculpatory" and that if the results had been available during Clemons's trial, it was "reasonably probable that [he] would have been convicted."[7] This appeal followed.

## STANDARD OF REVIEW

After holding a hearing regarding the results of post-conviction DNA testing, the trial court must "make a finding as to whether, had the results been available during the trial of the offense, it is reasonably probable that the [defendant] would not have been convicted." *See* Tex. Code Crim. Proc. Ann. art. 64.04 (West 2009). We review the trial court's decision under a bifurcated standard, providing almost total deference to the trial court's determination of historical fact issues and application-of-law-to-fact issues that turn on credibility or demeanor, and reviewing de novo other issues involving the application-of-law-to-fact issues that do not turn on credibility or demeanor. *See Johnson v. State*, 183 S.W.3d 515, 519-20 (Tex. App.—Houston [14th Dist.]

---

[7] Instead of stating that it was "not reasonably probable that Clemons would not have been convicted," which would have tracked the language of the applicable statute, *see* Tex. Code Crim. Proc. Ann. art. 64.04 (West 2009), the trial court stated that it was "reasonably probable that [Clemons] would have been convicted" if the DNA results had been available at trial. Because the trial court's conclusion is simply an affirmative way of expressing the language in the statute, we see no error in it.

9

2006, pet. ref'd, untimely filed); *Booker v. State*, 155 S.W.3d 259, 266 (Tex. App.—Dallas 2004, no pet.). Although there may be subsidiary fact issues that we review deferentially, we review de novo the ultimate question of whether a reasonable probability exists that the defendant would not have been convicted if the DNA results had been available during trial. *See Johnson*, 183 S.W.3d at 520; *Booker*, 155 S.W.3d at 266; *Fuentes v. State*, 128 S.W.3d 786, 787 (Tex. App.—Amarillo 2004, pet. ref'd); *Hicks v. State*, 151 S.W.3d 672, 675 (Tex. App.—Waco 2004, pet. ref'd).

## DISCUSSION

Clemons contends that the trial court erred in finding that it was reasonably probable that he still would have been convicted had the DNA results been available at trial. Specifically, Clemons argues that the trial court should have found that it was reasonably probable that he would not have been convicted because: (1) the DNA results excluded or exculpated him by suggesting that someone else committed the assault, and (2) the DNA results excluded the red condom, which would in turn exclude evidence of the extraneous offense against T.S. We address each argument in turn and then address the ultimate issue of whether the trial court erred in concluding that there was not a reasonable probability that Clemons would not have been convicted if the DNA results had been available at trial.

### Whether DNA Results Exclude Clemons

Clemons concedes that the 2007 report issued by Orchid Cellmark ("the Orchid Report") concluded that Clemons could not be excluded as a contributor to the vaginal swab taken from W.S. However, in three arguments, he contends that other details within the Orchid Report

10

exclude him. For example, in his first argument, he points to a chart in the Orchid Report in which Orchid Cellmark compared the "mixture detected from the epithelial fraction" of the vaginal swab to a database of 3,561 males and found that the mixture occurred with a frequency of "0 in 985" among African-Americans and "0 in 59" among Sub-Saharan Africans, while it occurred with a frequency of "1 in 103" among Vietnamese. Because Clemons is African-American, he asserts that the statistical results in the chart exclude him as a contributor to the vaginal swab and suggest that someone else was the assailant.

However, as conceded by Clemons, the conclusion stated in the Orchid Report is that Clemons could not be excluded as a contributor to the vaginal-swab sample. In addition, Eisenberg testified at the hearing that Orchid Cellmark's conclusion that Clemons could not be excluded as a contributor to the vaginal-swab sample was "scientifically valid." Further, Clemons did not address the statistical chart in the Orchid Report during the hearing, and neither Mills nor Eisenberg testified at the hearing about the significance of the chart. Thus, Clemons's argument that the chart somehow excludes him or suggests that someone else was the assailant is not supported by the record. We therefore reject the argument.

In his second argument, Clemons contends that he can be excluded as the assailant because part of the Orchid Report shows that several of the alleles[8] in his DNA sample did not match the alleles in the vaginal-swab sample. Clemons asserts that the evidence, "at best . . . was only that [he] cannot be excluded." In taking this position, Clemons concedes his argument. As previously

---

[8] An "allele" is defined as "any one of two or more genes that occupy the same location on homologous chromosomes and determine the heredity of a particular trait." *Neighbors v. State*, No. 13-09-00037-CR, 2010 Tex. App. LEXIS 2356, at *8 n.2 (Tex. App.—Corpus Christi April 1, 2010, no pet.) (mem. op., not designated for publication).

mentioned, the DPS and Orchid Cellmark testing resulted in the conclusion that Clemons could not be excluded as a contributor to the vaginal-swab sample. Both Mills and Eisenberg also testified to that effect. Clemons states as much in his brief, and he cites to no other conclusion in the record. Thus, we reject the argument.

In his third argument, Clemons asserts that he can be excluded as the assailant because W.S. testified that she was assaulted by only one man, and the Orchid Report states that "the epithelial fraction of the [vaginal swab] is a mixture of two males" and the "sperm fraction of the [vaginal swab] is a possible mixture of two males." However, the Orchid Report also states that Clemons cannot be excluded as a contributor to the mixtures. Once again, Clemons does not cite to an alternative conclusion in the record or suggest how the possibility of a second assailant would exclude him as a contributor to the sample. Accordingly, we reject Clemons's third argument.

Because the record does not support Clemons's contentions that he should be excluded as a contributor to the vaginal-swab sample taken from W.S., we reject his arguments.

***Whether DNA Results Exclude Evidence of Extraneous Offense***

It is undisputed that the most recent DNA testing in this case resulted in the conclusion that the red condom that was used as evidence against Clemons at his trial has no relevance to the case. Specifically, Mills testified that based on findings that both Clemons and W.S. were excluded as contributors to the substances on or in the condom, DPS could not establish a link between the condom and the case. Eisenberg similarly testified that, given that the substances on the condom were found not to be associated with Clemons or W.S., "[the] condom ha[d] no

12

significance to this case." Accordingly, the red condom would not have been admitted at Clemons's trial. *See* Tex. R. Evid. 402 ("Evidence which is not relevant is inadmissible.").

In addition to all of the references to the red condom at trial, Clemons asserts that evidence of the extraneous offense—the abduction of T.S.—would have also been excluded because the red condom was the "essential link" between the two incidents. We disagree, as there are several pieces of evidence other than the red condom that link the two incidents.

The first link between the two incidents is that both W.S. and T.S. identified Clemons as their assailant. W.S. identified Clemons as her assailant in a six-person photo lineup after her assault, and she also identified him at trial. T.S. identified Clemons in the same six-person photo lineup after her abduction and again at trial. In addition, W.S. and T.S. similarly described the clothes their assailant was wearing. Officer Simpson testified that W.S. described her assailant's clothes as being "a blue work shirt and blue pants." Sergeant Shane testified that in a videotaped interview of W.S. after the assault, W.S. stated that her assailant wore a light blue shirt with some of the patches ripped off. T.S. testified that her assailant had been wearing a light blue shirt and dark blue pants and that a patch had been torn off the shirt.

The two victims also independently identified the same remote location on Smith and Hester Roads, off of Ed Bluestein Boulevard, as the location where their assailant took them. In the following exchange between the prosecutor and Sergeant Shane, Sergeant Shane testified about driving with W.S. when she recognized the location of the assault:

State:       After further investigation, were you able to locate the scene of the
             actual assault itself?

13

Shane:      Not immediately, but ultimately we were able to.

State:      What was involved in that process?  How did you do that?

Shane:      Which one?

State:      In finding the scene of the sexual assault?

Shane:      That morning she was able to show Officer Simpson up to a certain point where this had—where they had gone in the car.  Later, after talking with her and getting, you know, more details about where this had happened, I had worked out in the area for several years and was quite familiar with the area and some of the more desolate parts of the district and stuff, so we were driving around and I asked her again to try and show us where this had happened, so we got up to a certain point on Ed Bluestein, where she was able to say for sure that this is where they had gone in the car, and she said, "Well, I think that we turned left here."  And I said, "Okay, but first I want to go down here a second and come back."

                                *       *       *

State:      Sergeant Shane, were there any landmarks that were significant at that area, Smith and Hester Roads, that helped you find out where the scene of the actual assault occurred?

Shane:      Well, there was a—the child had spoken about a gate that she had seen when they had pulled in there; however, when I drove in there the gate was not visible, but as soon as I drove down in there she immediately recognized the area and said, "This is where it happened."  She didn't direct me down there, but I drove down in there, and when I got down in there—I suspected this is where it happened, and when I got down in there she was able to say, "This is where it happened."

State:      You said she had mentioned a gate.  Did you find a gate in that area?

Shane:      Yes, we did.  The gate was open at the time, so that the—you know, it was pulled back and [the two parts of the gate] were not necessarily visible from the road, but had they been closed, then they would have formed across the road and would have been visible.  That's not what made her recognize the area the day that we went.

Regarding the location where T.S.'s assailant took her, T.S. testified that Clemons drove her on Ed Bluestein Boulevard and then turned onto two subsequent dirt roads. Officer Hardesty testified that he was at the scene of W.S.'s assault at Smith and Hester Roads with Sergeant Shane and that he returned to the same location the following day to interview a truck driver regarding T.S.'s abduction. The truck driver was a witness to the incident involving T.S., which had occurred at that location. Hardesty testified that the man was "very trustworthy and straightforward."

Further, Shane's testimony regarding W.S.'s identification of the location of her assault suggests that Shane did not notice the red condom until after W.S. made the identification:

State:          After going out and finding out—discovering where the scene of the actual assault occurred, what did you then do?

Shane:          At the scene?

State:          Yes, sir, at the scene.

Shane:          I recall we took some photographs out there that day and we were able to walk up the road and find pretty much exactly where it had happened, because we found the condom laying in the road there, on the side of the road.

Another way in which the incidents were linked is that they occurred on the same day, April 25, 1990. In addition, W.S. and T.S. were similar in stature. Although W.S. was a twelve-year-old child and T.S. a twenty-year-old woman at the time of the assaults, T.S. testified that she was only five-feet-two-inches tall and weighed only about one-hundred-and-five pounds. Both victims also testified that their assailant first asked them if they wanted a ride, and once they refused, then pulled them toward his car. Specifically, W.S. testified that her assailant grabbed her by the arm

15

and "drug [her] to his car." T.S. testified that he pulled her by her wrists toward his car, and she was "pulling back."

Both attacks were also sexual in nature and included the assailant grabbing the victims so hard when they tried to get out of his car that he pulled off at least some of their clothing. W.S. testified that her assailant grabbed her by the neck when she tried to get out of the car and that he "made [her] pull [her clothes] off when he grabbed [her] by [her] neck." T.S. testified that when she tried to get out of the car, her assailant grabbed her on the neck, and as she tried to fight him off, he "grabbed [her] on [her] jacket and [her] shirt came off with the jacket."

Considering all of the evidence aside from the red condom showing similarities between the two incidents, we reject Clemons's argument that the red condom was the "essential link" between the two incidents and that the exclusion of the red condom would result in the exclusion of evidence of the extraneous offense against T.S.

***Whether Trial Court Erred in Deciding Ultimate Issue Against Clemons***

As previously stated, we review de novo the ultimate question of whether a reasonable probability exists that the defendant would not have been convicted if the DNA results had been available at trial. *See Johnson*, 183 S.W.3d at 520; *Booker*, 155 S.W.3d at 266; *Fuentes*, 128 S.W.3d at 787; *Hicks*, 151 S.W.3d at 675. Based on the most recent post-conviction DNA testing in this case, the evidence that would have been excluded at trial was that of the red condom found at the crime scene. Clemons contends that there is a reasonable probability that the exclusion of the red condom at trial would have resulted in his acquittal. We disagree. Although the State

16

made several references to the red condom during trial, there is a considerable amount of other evidence indicating Clemons's guilt.

As previously stated, both W.S. and T.S. identified Clemons as their assailant. They separately identified Clemons in a photo lineup in the days after their abductions, and they identified him again at trial. In fact, W.S. viewed more than one book of photos before viewing the photo lineup and did not identify anyone until she saw Clemons's photo in the photo lineup. Also, W.S. and T.S. provided similar descriptions of their assailant's clothing, and clothing matching their descriptions was found in the clothes hamper at Clemons's apartment. Specifically, W.S. stated that her assailant wore a blue work shirt and blue pants. She further stated that the shirt was light blue and that some of the patches were ripped off. At trial, T.S. testified that her assailant had been wearing a light blue shirt and dark blue pants and that a patch had been torn off the shirt. When officers arrested Clemons at his apartment, they found a light-blue shirt and a pair of blue pants in a hamper. Sergeant Shane described the clothes they found as "work" clothes and testified that patches had been removed from the shirt. In addition, W.S. identified Clemons's Oldsmobile Toronado as the car driven by her assailant.

Further, when Clemons was arrested, he was carrying documents addressed to T.S. Specifically, T.S. testified that her assailant kept her purse when he drove away, that she had important documents in her purse, and that she had been applying for food stamps at the time of the abduction. When officers arrested Clemons, he was carrying letters from the Texas Department of Human Services addressed to T.S. and indicating that T.S. had been approved for food-stamp benefits. Also, Chemist Steve Robertson testified that he analyzed red carpet fibers taken from Clemons's car and red fibers removed from the clothing W.S. wore at the time of the assault and that

he determined that the fibers from Clemons's car matched the fibers found on W.S.'s clothing. Finally, the updated DNA results indicate that Clemons cannot be excluded as a contributor to the vaginal and pubic swabs taken from W.S.

Considering all of the evidence other than the red condom supporting a conviction, we conclude that the trial court did not err in determining that there was not a reasonable probability that Clemons would not have been convicted if the most recent DNA results had been available at trial. *See* Tex. Code Crim. Proc. Ann. art. 64.04.

## CONCLUSION

Because we find no error in the trial court's conclusions, we affirm the trial court's order.

_____

Diane M. Henson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: May 14, 2010

Do Not Publish

18