Affirmed and Memorandum Opinion
filed July 12, 2011.

 

In
The

Fourteenth
Court of Appeals



NO. 14-10-00959-CR



Pete Perez, Appellant 

v.

The State of
Texas, Appellee 



On Appeal from
the 185th District Court

Harris County, Texas

Trial Court
Cause No. 757191



 

MEMORANDUM OPINION 

On August 26, 1998, appellant Pete Perez was
convicted by a jury of the offense of sexual assault and sentenced to 30 years’
confinement.  This court affirmed appellant’s conviction on direct appeal on
June 1, 2000.  Perez v. State, 21 S.W.3d 628 (Tex. App.—Houston [14th
Dist.] 2000, no pet.).  On April 14, 2003, Perez filed a request for
appointment of counsel for the purpose of post-conviction DNA testing.  On December
31, 2008, appellant’s appointed counsel filed a motion for post-conviction DNA
testing pursuant to Chapter 64 of the Texas Code of Criminal Procedure.  The
convicting court granted appellant’s requested testing and thereafter held a
hearing regarding the results.  Appellant now appeals from the trial court’s
finding that the test results were “not favorable” to him.  We affirm.

DNA Hearing

Pursuant to the trial court’s order, Jennifer Watson,
a DNA analyst for the Texas Department of Public Safety Crime Laboratory,
examined the shorts that the complainant, M.B., wore on the night she was
sexually assaulted, as well as certain other evidence.  Watson testified at the
hearing on August 12, 2010, that DNA testing had established that there was blood
but no semen on the shorts.  The testing further revealed that some of the
stains were mixtures of blood from M.B. and an individual identified as Jimmy
Luna.  Appellant was excluded as a contributor as to all DNA present in the
evidence.

Analysis

In his sole issue, appellant contends that the trial
court erred in finding that the results were not favorable to him.  Appellant
principally argues that the DNA test results, which excluded him as a source of
the blood found on M.B’s shorts, established a reasonable probability of his
innocence.

Once a trial court has ordered and received DNA test
results, the court must “hold a hearing and make a finding as to whether, had
the results been available during the trial of the offense, it is reasonably
probable that the person would not have been convicted.”  Tex. Code Crim. Proc.
art. 64.04. The trial court specifically ruled that appellant failed to show
that it was reasonably probable that he would not have been convicted if the
DNA test results had been available at his trial.

We review the trial court’s decision under a
bifurcated standard, providing almost total deference to the court’s
determination of historical fact, and application-of-law-to-fact issues that
turn on credibility or demeanor, but reviewing de novo other issues involving
the application of law to facts.  Johnson v. State, 183 S.W.3d 515,
519-520 (Tex. App.—Houston [14th Dist.] 2006, pet. dism’d).  The ultimate
question of whether a reasonable probability exists that exculpatory DNA tests
would prove innocence is an application-of-law-to-fact question that does not
turn on credibility and demeanor and is therefore reviewed de novo.  Id.
at 520.

In order to demonstrate a “reasonable probability”
that he would not have been convicted, as required under article 64.04,
appellant must show a reasonable probability that exculpatory DNA tests would
prove his innocence.  Rivera v. State, 89 S.W.3d 55, 59 (Tex. Crim. App.
2002).  A reasonable probability of innocence exists when there is a
probability sufficient to undermine confidence in the outcome.  Id.; Thompson
v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).  A trial court does not
err in finding DNA test results “not favorable” if the post-conviction results
fail to demonstrate a reasonable probability of innocence in the face of other
evidence that is sufficient to establish guilt.  Johnson, 183 S.W.3d at
520.

At appellant’s 1998 trial, the complainant, M.B.,
testified that she had met appellant several years before the sexual assault
occurred.  They dated for a short time but had stopped dating about three
months before the offense.  M.B. further stated that on May 10, 1997, she was
staying at her friend Juan Pena’s apartment when appellant jumped through a
window and landed on her.  Appellant said, “Bitch, get up and get your clothes
on.”  While M.B. dressed, appellant hit Pena in the face.  M.B. stated that appellant
dragged her out of the apartment and down the street until they arrived at a
“whole bunch of bushes.”  Appellant threw her down, removed her clothes,
threatened to kill her, and hit and kicked her, saying, “this is for fucking
that man.”  Appellant bloodied M.B.’s nose and mouth.  According to M.B.’s
testimony, once appellant removed her shorts, he inserted a stick inside of her
and then placed his penis inside her vagina but ultimately ejaculated “all over
the outside” of her vagina.  Afterward, M.B. put her shorts back on.  Appellant
forced her to stay with him the remainder of the night.

M.B. further testified that on the next day,
appellant forced her to accompany him to various places by threatening to kill
her.  When appellant again threatened to kill her, M.B. ran away and managed to
escape.  She eventually made her way to Ben Taub Hospital, where she underwent
an examination in which vaginal swabs were taken.  In her testimony, M.B.
acknowledged that she at times either lived with friends or on the street and
had been convicted for prostitution four times.

Juan Pena testified that appellant was the person who
took M.B. from Pena’s apartment before the assault.  Maria Gonzalez, a
registered nurse at Ben Taub testified that she performed a rape kit
examination of M.B. on May 12, 1997.  She observed bruises on M.B.’s face,
body, and vagina and described complainant’s vaginal injuries as inconsistent
with consensual sex.

James Bolding, a DNA analyst from the Houston Police
Department Crime Laboratory, testified at the 1998 trial that he examined
evidence taken as part of M.B.’s rape kit.  He analyzed the vaginal swabs and
smears and found no evidence of male secretions on these items.  He also found
no semen on  M.B.’s jean shorts and black t-shirt but did find blood on the
shorts.  No DNA evidence was introduced during the trial.

Appellant contends the post-conviction DNA test
results establish a reasonable probability that he would not have been
convicted if such results had been available at his trial because the test
results revealed: (1) there was no semen on M.B.’s shorts, which contradicts
M.B.’s testimony that she “pulled on her shorts immediately after the appellant
ejaculated onto her vaginal area,” and (2) appellant’s DNA was not found in the
blood stains on the shorts while the DNA of a man identified as Jimmy Luna was
contained in the blood stains.

Regarding appellant’s first assertion, evidence of
the absence of semen on M.B.’s shorts does not create a reasonable probability
that he would not have been convicted because similar evidence was presented at
his trial in 1998.  Bolding testified that there was no semen on the vaginal
swabs and smears that were collected from M.B. at the hospital.  He also found
no semen on M.B.’s jean shorts and black t-shirt.  See Cate v. State,
326 S.W.3d 388 (Tex. App.—Amarillo 2010, pet. ref’d) (finding that defendant
failed to satisfy his article 64.04 burden when his theory to attack his
conviction, predicated on the post-conviction DNA test results, was the same
theory of attack proffered to his convicting jury); Frank v. State, 190
S.W.3d 136 (Tex. App.—Houston [1st Dist.] 2005, pet. ref’d) (finding defendant
failed to prove that he would not have been convicted had the post-conviction
test results been available during his trial because the post-conviction DNA
test results were identical to the DNA results before trial).

Appellant’s second assertion is that the absence of
his DNA and the presence of another man’s DNA in the blood stain on M.B.’s
shorts establish a reasonable probability that appellant would not have been
convicted if this evidence was presented at his trial.  Although this evidence
is to some degree potentially exculpatory in nature, we cannot consider it in a
vacuum; instead, we must evaluate it in the context of the other relevant
evidence.  See Johnson, 183 S.W.3d at 520. 

Although there was evidence at the 1998 trial that
M.B. bled on her shorts after appellant beat her, there was no evidence
suggesting that the person who sexually assaulted her bled during the
commission of the offense.  Indeed, there was no evidence indicating that the
additional source of the blood stain was connected to the sexual assault in any
way. 

Furthermore, there was no evidence indicating when
Luna’s blood may have been placed on M.B.’s shorts.  M.B. was sometimes
homeless and frequently worked as a prostitute, so the blood on her shorts
could have been deposited on them at a different time than during the sexual
assault.  Cf. id. (finding fact that DNA test results showing DNA in
semen stain on rape victim’s underwear did not match defendant’s DNA did not
favor defendant since the victim was sexually active during the period of time
the sexual assault occurred).

The trial court’s conclusion is further supported by
the evidence at trial of appellant’s guilt.  See id.  M.B. identified
appellant as her attacker, and her testimony was corroborated by a witness who
saw appellant with M.B. immediately before the assault.  See id. at 521.
 M.B. testified that at the time of the sexual assault, she had known appellant
for several years and had dated him for several months.  Given her familiarity
with appellant, there was less likelihood of a misidentification of her
attacker.  See Cate, 326 S.W.3d at 390 (finding evidence in the form of
rape victim’s quite certain identification of appellant as her attacker was
sufficient, independent of the DNA evidence, to support that a reasonable
probability of innocence did not exist).  Furthermore, M.B.’s testimony was
corroborated by Juan Pena, who identified appellant, a person he reportedly saw
on a daily basis, as the person who took M.B. from Pena’s apartment right
before the sexual assault occurred.  Finally, M.B.’s testimony about the manner
of the sexual assault was corroborated by the hospital nurse who observed
bruises on M.B.’s face, body, and vagina, and who described M.B.’s vaginal
injuries as inconsistent with consensual sex. 

The evidence therefore supports the trial court’s
conclusion that there was not a reasonable probability that appellant would not
have been convicted if the post-conviction DNA results had been available at
his trial.  Consequently, the trial court did not err in finding that the
results were not favorable to appellant.  We overrule  appellant’s sole issue.

We affirm the trial court’s order.

                                                                                    

                                                                        /s/        Martha
Hill Jamison

                                                                                    Justice

 

 

Panel consists of Justices Frost, Jamison, and McCally.

Do Not Publish — Tex. R. App. P. 47.2(b).