COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-09-403-CR

 

 

ANTHONY TROY LOCKETT                                                   APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM
CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. 
Introduction

In two
issues, Appellant Anthony Troy Lockett appeals the denial of his postconviction
request for forensic DNA testing.  We
affirm.

 

 








II. 
Factual and Procedural History

A.  Trial and Appeal

On July
29, 1996, a jury convicted Lockett of murder, and the trial court sentenced him
to forty years= confinement.  On October 16, 1997, after reviewing the
legal and factual sufficiency of the evidence to support his conviction, we
affirmed it.  See Lockett v. State,
No. 02-96-00458-CR, slip op. at 10 (Tex. App.CFort
Worth Oct. 16, 1997, pet. ref=d) (not
designated for publication).  To provide
context for our discussion below, we briefly summarize the facts as revealed by
the record in this case and our prior opinion. 


On May
30, 1994, Lockett, who had spent the day drinking with his friend Lance Boyer,
told Boyer that he could arrange for them to have group sex with Lockett=s
girlfriend, Joann Wolfe.  Lockett called
Wolfe and, without informing her of their intent, asked her to pick them up at
Boyer=s
trailer, and she did so.  During the
return to her apartment, Wolfe and Lockett argued, and when they arrived, she
jumped from her car, ran into her apartment, and locked the front door.  Undeterred, Lockett scaled the exterior wall
to the second story balcony, entered Wolfe=s apartment,
and let Boyer in the front door.  When
the argument resumed, Lockett grabbed Wolfe, shook her, and hit the back of her
head against the wall.        








Boyer
did not see Lockett cause a wound that drew blood from Wolfe=s
frontal scalp, but he left the apartment when Lockett slapped him for trying to
intervene.  When he returned ten to
fifteen minutes later, Lockett was sitting on the bed, and Wolfe had locked
herself in the bathroom.  He saw blood in
the living room that he had not noticed before. 
At Wolfe=s request, Boyer put her gown
and car keys where she could reach them under the bathroom door. Thirty seconds
later, Wolfe, with blood on her face, ran out of the apartment, down the
stairs, through the breezeway, and across the parking lot as Boyer watched.[2]


Lockett
wiped blood from the kitchen wall with his shirt, telling Boyer that he Adidn=t want
to make it look as bad as it seemed.@  Boyer helped him, wiping blood from the
kitchen pantry door.  Lockett cleaned
himself up and they left the apartment. 
He told Boyer that Ahe felt
bad and he lost control.@[3]  Around 3 a.m., after he and Boyer split up,
Lockett was arrested for public intoxication in the car lot of a nearby
dealership.[4]








About 6
a.m., Wolfe=s body was discovered face-down
underneath a stairwell in the breezeway of the apartment building across the
parking lot from her apartment.  She was
wearing a gown and clutching her car keys. 
The medical examiner, who had initially declared that Wolfe died from
hypertension or cardiovascular disease, ruled that her death was a homicide
after he spoke with investigating officers. 
Specifically, he opined that she died from a closed head injury due to a
blunt force trauma, which was a result of the frontal laceration on her scalp
that caused her brain to swell. 

Many
items of physical evidence were collected from Wolfe=s
apartment,[5]
and some had what appeared to be blood on them although no DNA testing was
conducted, blood‑type testing revealed that the blood that could be
classified as human and typed was Wolfe=s Type O
blood, and not Lockett=s Type A blood.  A pink towel found in Wolfe=s
bathroom contained both Type O and Type B blood stains.








B.  DNA-Testing Hearing

After
this court conditionally granted Lockett=s pro se
petition for writ of mandamus seeking to have the trial court rule on his
motion for DNA testing,[6]
the trial court held a hearing in September 2009.  At this hearing, Lockett=s counsel
requested a DNA test on the pink towel. 
The trial court denied this request as it had denied Lockett=s
earlier request in November 2003, and it adopted the State=s
proposed findings of fact and conclusions of law.

1.  Findings of Fact

The trial court made the following pertinent fact
findings:

 

1.  The
defendant was convicted by a jury of the offense of murder, and was sentenced
to forty years= confinement on August
27, 1996.

 

. . . .

 

3.  The
Court denied the defendant=s [November 3, 2003] motion on the grounds that
identity was not an issue since the defendant admitted causing Joann Wolfe=s head injury when he
knocked her into the edge of the kitchen wall, and that the defendant would be
unable to establish that he would not have been convicted if DNA testing was
done given the substantial evidence of guilt.

 

. . . .

 








6.  On
September 9, 2009, the Court heard arguments on the merits of the defendant=s [2008] request for
forensic DNA testing.

 

7.  During
that [September 9, 2009] argument, the defendant limited his request to the
pink towel found on the floor of the bathroom in Jo[ann] Wolf[e]=s apartment.

 

8.  The
defendant=s identity was not or is
not an issue in this case because he caused Ms. Wolfe=s head injuries in the
presence of a witness, Lance Boyer.

 

9.  Joann
Wolfe became angry at the defendant while driving him and Boyer to her
apartment.

 

10.  When
Ms. Wolfe arrived home, she ran upstairs and locked the defendant and Boyer
outside.

 

11.  The
defendant climbed up the balcony to Ms. Wolfe=s apartment and forced
his way inside, and then let Boyer inside.

 

12.  The
defendant and Ms. Wolfe resumed argument, which escalated into a fight.

 

13.  The
defendant soon overpowered Ms. Wolfe and began to choke her.

 

14.  Boyer
saw the defendant shake Ms. Wolfe and hit the back of her head against the
wall.

 

15.  After
a failed intervention, Boyer left the apartment and abandoned Ms. Wolfe to the
defendant=s attack.

 

16.  When
Boyer returned ten or fifteen minutes later, Ms. Wolfe was locked in the
bathroom and the defendant was sitting on the bed.

 

17.  After
obtaining her gown and car keys from Boyer, Ms. Wolfe ran out of the apartment.

 








18.  Even
with his poor vision, Boyer saw blood on Ms. Wolfe=s face.

 

19.  Inside
the apartment, the defendant began cleaning up the mess created by the beating,
including wiping blood off the kitchen wall.

 

20.  The
defendant told Boyer that he didn=t Awant to make it look as bad as it seemed.@

 

21.  Ms.
Wolfe was discovered sometime before 6:00 a.m. in a breeze-way approximately
fifty yards from her apartment.

 

22.  Ms.
Wolfe was clutching her set of car keys in her lifeless hand.

 

23.  Ms.
Wolfe=s bare feet were fairly
clean suggesting to the police that she had not walked far.

 

24.  In
contrast to Ms. Wolfe=s apartment, very little
blood was found in the breeze-way near her bodyCmeaning that the fatal
wound was not inflicted in the breeze-way; and no blood was found on the
railing near her body.

 

25.  The
defendant admitted to Boyer that he felt Abad@ and had Alost control.@

 

26.  There
is no evidence that Ms. Wolfe=s alleged Areal@ attacker was injured.

 

27.  
Forensic DNA testing would not exonerate the defendant given the facts
detailed above since there was no opportunity for the defendant to leave his
DNA.

 

28.  The defendant has not demonstrated by a
preponderance of the evidence that forensic DNA testing would establish his
innocence.  [Internal citations omitted.]

 








2.  Conclusions of Law

The
trial court concluded that identity was not an issue because Lockett caused
Wolfe=s head
injury in Boyer=s presence and that, A[g]iven
the substantial evidence that [Lockett] caused Ms. Wolfe=s head
injury,@ Lockett
could not demonstrate by a preponderance of the evidence that forensic DNA
testing would establish his innocence.

III. 
Motion for DNA Testing

Lockett
complains that the trial court erred by denying his request for postconviction
forensic DNA testing of the pink towel found in Wolfe=s
apartment.

A.  Standard of Review

We
employ a bifurcated standard to review a trial court=s
decision to deny a motion for DNA testing, affording almost total deference to
the trial court=s determination of issues of
historical fact and application‑of‑law‑to‑fact issues
that turn on credibility and demeanor and reviewing de novo other application‑of‑law‑to‑fact
issues that do not turn on credibility and demeanor. See Rivera v. State,
89 S.W.3d 55, 59 (Tex. Crim. App. 2002).

B.  Texas Code of Criminal Procedure Article
64.03








The
trial court must order DNA testing only if statutory preconditions are
met.  Bell v. State, 90 S.W.3d
301, 306 (Tex. Crim. App. 2002).  Here,
Lockett had to show (1) that identity was an issue in the case and (2) that, by
a preponderance of the evidence, he would not have been convicted if
exculpatory results had been obtained through DNA testing.[7]  See Tex. Code Crim. Proc. Ann. art.
64.03(a)(1)(B), (a)(2)(A) (Vernon 2006). 
The requirement that identity be an issue in the case is not satisfied
simply by a plea of not guilty.  Prible
v. State, 245 S.W.3d 466, 470 (Tex. Crim. App.), cert. denied, 129
S. Ct. 54 (2008); see Tex. Code Crim. Proc. Ann. art.
64.03(a)(1)(B).  And if DNA testing would
not determine the identity of the person who committed the offense or would not
exculpate the accused, then article 64.03(a)(2)(A)=s
requirement has not been met.  Prible,
245 S.W.3d at 470; see also Smith v. State, 165 S.W.3d 361, 364 (Tex.
Crim. App. 2005) (reciting article 64.03=s
legislative bill analysis, which states, AThe
defendant must prove that, had the results of the DNA test been available at
trial, there is a 51% chance that the defendant would not have been convicted.@).

C.  Analysis

At issue
is whether the identity of the person who caused Wolfe=s death
was in question and whether a DNA test of the pink towel could establish by a
preponderance of the evidence that Lockett would not have been convicted.








Lockett
argues that identity is an issue in this case because he did not confess to the
killing and because he was in custody three hours prior to the discovery of
Wolfe=s
body.  His theory is that 

after Boyer and [Lockett] left, Wolfe changed clothes at least twice,[[8]]
prepared chicken, placed it in the oven, placed wine glasses out and an array
of flowers on the kitchen bar, changed into a blue dress, bloodied it somehow,
tore one strap off somehow, ripped off eight buttons somehow, changed out of
the blue dress and into a white gown with a flower print design, left the
apartment for whatever reason and died in front of apartment Number 1814, in
the breezeway of Building 18, sometime just before 6:00 A.M. During this period
of time someone in her bedroom bathroom was bleeding on her blood (the blood
mixed and fresh enough to test[]) and that person was type AB@ blood. 

 








He contends that the Type B
blood on the pink towel indicates the presence of another bleeding individual
inside the apartment on the night of the murder and that testing the Type B
blood could lead to identification of that other person or at least point to
another person Aunknown in identity@
sufficient to Asuggest a fairly high
probability that someone else murdered the deceased.@  Lockett proposes that adding the DNA evidence
to the circumstantial evidence of his innocence would result in a likelihood of
a not-guilty verdict.[9]  We disagree. 
    First, contrary to Lockett=s assertion that
Wolfe=s body was not in
the breezeway until after 5:30 a.m. and after he was already in police custody,[10]
Mark Coles, a resident of the apartment building with the breezeway where Wolfe
was found and who gave the testimony that Lockett relies on, testified as
follows:

Q.  Okay.  And didCWhen did you tell the police about this [seeing Lockett
enter Wolfe=s apartment through the balcony]?

 

A.  I told the police
the following day because I went to work the next morning, and I didn=t see anyone around. 
And when I came home, that is when I saw the police.  And I said, wellCI asked someone what had
happened.  And they said the girl in the
upstairs apartment had been found murdered outside the breezeway.

 








And I said, AWell, I think I saw who did it.@ 
And so I went and told the apartment complex manager, and she said[, AY]ou better go talk to the police.[A] 
And I talked to a couple of policemen and told them my story.

 

Q.  When you went
out to your car, you had to leave that morning. 
Did you see a body?

 

A.  No sir.

 

. . . .

 

Q.  . . .  What time did you go to work the next day?

 

A.  I went to work
at 5:30 in the morning.

 

Q.  You were in the
upstairs apartment, correct?

 

A.  Yes, sir.

 

Q.  When you went
down the stairs, did you look behind you underneath the stairs?

 

A.  No, sir, I did
not.

 

Q.  Would it have
been possible for someone to have been standing there and you not have seen
them?

 

A.  Going down the
steps?

 

Q.  Yes, sir.

 

A.  Yes, sir,
probably so, because going down the steps, I rarely look back behind me.

 

Q.  Where was your
car parked out down the stairs?

 

A.  Out in front.

 

Q.  And you walked
out to your carCWas it parked directly in front of
that breezeway, or down one or twoC








 

A.  It was downCdown toward the left side of the
breezeway.

 

Q.  So when you
turned around, I would assume to get in your car, you wouldn=t have been able to see underneath
the staircase anyway?

 

A.  No, sir.

 

Q.  And you didn=t look to begin with?

 

A.  Exactly.

 

[Emphasis added.] Other testimony at trial
revealed that when Wolfe=s body was discovered around 6 a.m., it
was discovered underneath the stairwell in the breezeway.  Coles=s testimony is
consistent with Wolfe=s body having already been in the
breezeway before Lockett was taken into custody around 3 a.m.

Additionally, in a statement to the police that was read to
the jury, Lockett described his altercation with Wolfe as follows:

 

We had only been there [at Wolfe=s apartment] about 30 minutes when
Joann got mad.  I don=t know for sure what she was mad
about.  I think she [got] mad because
[Boyer] was with me. Me and Joann got into a shoving match in the living
room.  She shoved me and I shoved her.

 








We were standing in the living room next to the kitchen
when I shoved Joann.  She hit her head on
the edge of the kitchen wall, and her head started bleeding and she sat down on
the floor.  Joann immediately got up and walked out the
front door.  Joann was mad at me and had
been telling me to leave before we got into the pushing match.  And after we got into the pushing match and
she hit her head, I figured I would end up going to jail for assault so me and
[Boyer] left.

 

Before we left we saw Joann walk to the apartment building
directly across from her apartment.  And
I saw her go inside one of the apartments on the left downstairs.

 

. . . .

 

I did not kill
Joann.  She was alive at the neighbor=s apartment when I
left.  [Emphasis added.]

Therefore,
although Lockett accurately complains that he did not confess to murder when he
put AI did not kill
Joann@ into his
statement to the police, other parts of his statementCparticularly his
admission that he caused a bleeding head injuryCin light of the
medical examiner=s testimony and the photographic exhibits
that indicate the only laceration that Joann suffered that night was a bleeding
head injury, weigh against his argument that DNA-testing would exculpate him.

Finally, contrary
to Lockett=s assertion that A[b]lood type >B= was found on
numerous items including the pink towel,@ of the items at
trial, the pink towel is the only item that clearly has both types.  And while many of the items had what appeared
to be blood on them and some actually had Type O blood on them, others were
ruled not positive for blood, positive for blood but unable to be blood-typed,
or positive for blood but unable to confirm whether the blood was human.













In sum,
Lockett=s
position is simply that someone else caused the injuries to Wolfe that resulted
in her death:  Identity is an issue
because someone else did it, and he would probably have been found innocent
because someone else did it.  However,
Lockett has not shown a reasonable probability that the requested DNA test
would prove his innocence because, assuming the blood typing tests were done
correctly, there was already evidence before the jury of the presence at some
point of a hypothetical third person in the apartment.  The timing of this presence is unknown.  What is known is that an altercation occurred
in the apartment which, in Boyer=s
presence, included Lockett choking Wolfe and slamming her head against the
wall.  After Boyer=s
ten-to-fifteen-minute absence, during which the fight between Lockett and Wolfe
continued, Boyer returned to witness blood in the living room and in the
kitchen and blood on Wolfe=s face
as she fled the apartment.  And the
medical examiner testified that blunt force trauma resulted in the laceration
that caused Wolfe=s death. Other than an
unexplained Type B blood spot on the pink towel,[11]
there is no other direct evidence of the presence of anyone besides Lockett,
Boyer, and Wolfe inside the apartment that night, and no evidence at all that
the Adonor@ of this
blood was the murderer.[12]  








Considering
Lockett=s
allegations in light of the facts of this case, we conclude that the trial
court did not err by denying Lockett=s motion
because Lockett failed to meet his burden under article 64.03(a)(1)(B) and
(a)(2)(A).  See Tex. Code Crim.
Proc. Ann. art. 64.03(a)(1)(B), (a)(2)(A); Prible, 245 S.W.3d at 470 (AEvidence
of another person=s DNA in addition to Appellant=s is not
exculpatory evidence in this case due to the additional evidence presented at
trial.  Thus, even if the evidence was
retested and determined to contain another person=s DNA .
. . , it would not establish by preponderance of the evidence that Appellant
would not have been convicted if the jury had heard that DNA from a third‑party
was present.@) (citation omitted); see
also Bell, 90 S.W.3d at 306 (considering an appellant=s due
process claim and reasoning that, without more, the presence of another person=s DNA at
the crime scene will not constitute affirmative evidence of an appellant=s
innocence).  But see Esparza v. State,
282 S.W.3d 913, 922 (Tex. Crim. App. 2009) (holding that, in sexual assault
cases, any overwhelming eye-witness identification and strong circumstantial
evidence supporting guilt is inconsequential when assessing whether a convicted
person has sufficiently alleged that exculpatory DNA evidence would prove his
innocence under article 64.03(a)(2)(A)); Blacklock v. State, 235 S.W.3d
231, 232B33 (Tex.
Crim. App. 2007) (holding that appellant=s motion
for DNA testing fairly alleged and showed by preponderance of the evidence that
the victim=s lone attacker was the semen
donor and that exculpatory DNA test results excluding appellant as the
donor would establish his innocence).  We
overrule both of Lockett=s issues. 

IV. 
Conclusion

Having
overruled both of Lockett=s issues, we affirm the trial
court=s
judgment. 

 

 

BOB MCCOY

JUSTICE

 

PANEL:  LIVINGSTON, C.J.;
GARDNER and MCCOY, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  August 31, 2010











[1]See Tex. R. App. P. 47.4.





[2]Boyer admitted that his
vision was blurry at around fifteen feet and that he was not wearing his
glasses that night.





[3]Lockett=s specific words to Boyer
were that he had Afucked up.@ 





[4]An officer stated that an
apartment resident told him that, in the early morning hours, some unknown
individuals who did not match Lockett=s or Boyer=s descriptions knocked on her door and her
neighbors= doors.  When the resident saw these individuals,
Lockett was already in police custody for public intoxication.





[5]In Wolfe=s apartment, investigating
officers found blood on a wall above a picture, on a wall in the living room,
and on the floor, and they found a blood-soaked and torn navy blue dress in the
bedroom.  Wolfe=s oven had been left on
with some chicken legs inside, making the apartment smoky, and there were
flowers on the bar area and various sets of wine glasses displayed.  The officers also found four blood transfer
stains, which occur when blood on one object touches another object, on the
wall behind where Wolfe=s body was found.





[6]See In re Lockett, No. 02-08-00452-CV,
2009 WL 1740145 (Tex. App.CFort Worth June 16, 2009, orig. proceeding) (mem.
op.). 





[7]Article 64.03=s other requirements are
not at issue in this appeal.





[8]Lockett relies on Boyer=s testimony that he
thought Wolfe was wearing pants when she came to pick them up at his
trailer.  But Boyer=s testimony is first that
he did not remember what Wolfe was wearing, followed by AI believe she was wearing
pants.  It has been so long.@





[9]Lockett lists the
following as circumstantial evidence of his innocence: (1) the way Wolfe died,
(2) what she was wearing when she was found, (3) what time her body was
found, and (4) that he was in custody three hours before her body was found.

The State lists the following as evidence that substantiates Lockett=s guilt:  (1) that he forced his way into Wolfe=s apartment, (2) that he
caused her fatal injuries in Boyer=s presence when he choked, shook, and hit her,
(3) that she was bleeding on her face when she left the apartment, (4) that
Lockett attempted to clean up the mess created by the beating by wiping blood
off the kitchen wall, (5) that Wolfe=s body was found approximately fifty yards from
her apartment in a breezeway, and (6) that Lockett admitted to Boyer that he
lost control and caused Wolfe=s injuries. 





[10]Lockett argues that he Awas in custody a full
three (3) hours before the deceased body was discovered in an area frequented
by others who said the body was not there until after 5:30 A.M. local time,
long after [he] was in police custody.@





[11]Boyer=s blood type was not
entered in evidence.





[12]As in many cases, some
questions remain unanswered, including at what point Wolfe=s body appeared in the
breezeway behind the stairs of the other apartment building.  Nevertheless, the jury found Lockett guilty,
and this court has previously affirmed his conviction after performing both
legal and factual sufficiency reviews.  See
Lockett, No. 02-96-00458-CR, slip op. at 2B6.